Howey, J.,
delivered the following opinion:
The magnitude of this cause and the importance of the issues raised by demurrer to the plaintiff’s petition of 698 printed pages of allegation and exhibit are causes sufficient to warrant full expression of opinion by any or all responsible for the result. Especially is this so because of the statement' contained in the brief of one of the learned counsel that it had been said that a suit for more than $61,000,000 never had been and never could be carried through, followed by the further declaration that it had been frequently stated that if this were a suit between private parties for a moderate amount there could be no question of its receiving favorable consideration. But who said it and by what authority % And why should the courts be thus discredited ? If the size of the claim could have anything to do with the result, the sooner this court retires from business the better for the citizen.
But any court must pause in considering so enormous a demand and be well assured of its merit before saying there is liability. Certainly statements in the nature of advance criticism can not have the effect of preventing the proper judgment in the discharge of an unavoidable duty, as that duty is understood.
Whilst concurring with many of the views expressed in the preceding opinion this opinion is submitted along somewhat different lines as covering my reasons for sustaining the demurrer to the petition.
Four great estates lying in what was formerly known as the Indian Territory (but now the State of Oklahoma) are involved. The plaintiff company, as the successor of the Kansas & Neosho Valley Eailroad, claims a grant in frcesenti of over 3,000,000 acres of land, covering 4,866 sections, or 135 solid townships, at the rate of 12,800 acres to the mile, through 243 miles of territory beginning at the southern line of Kansas and extending to the northern line of Texas. The area attached to and with whatever passed, according to the petition, embraced alternate sections on each side of the railroad. If anything was granted, it was in the nature of a float until the lands were surveyed as public lands of the United States. Upon such survey, it is *86 claimed, the grant specifically attached to every odd-numbered section within the 20-mile limit, and the case is presented on the theory that by the doctrine of relation when the road was located, built, and the lands were surveyed, the title acquired became specific, thereby reaching back to the date of the grant. This immense domain is valued at $20 an acre, for which a money judgment is asked of and from the defendants for something over $61,000,000.
Congress by an act approved July 25, 1866, 14 Stat., 236, granted, for the benefit of the original company, certain public lands in the State of Kansas. By section 1, ten alternate sections of land on each side of the road to every mile, to be selected within 20 miles of the railroad, were granted to the governor of that State to aid in the construction of the Kansas & Neosho Valley Railroad, and in the event of such lands having already been preempted, it was provided that lieu lands should be selected likewise within the 20-mile limit. There was attached to this grant a proviso:
“ That any and all lands heretofore reserved to the United States by any act of Congress, or in any other manner by competent authority, for the purpose of aiding in any object of internal improvement or other purpose whatever, be, and the same are hereby, reserved and excepted from the operation of this act, except so far as it may be found necessary to locate the route of said road through such reserved lands, in which case the right of way, 200 feet in width, is hereby granted, subject to the approval of the President of the United States: And provided further, That said lands hereby granted shall not be selected beyond 20 miles from the line of said road.”
Section 2 provided that the sections and parts of sections remaining should not be sold for less than double the minimum price. Section 3 provided for the free transportation of Government troops and the terms upon which the lands should be patented to the railroad and that if the road should not be completed within two years the unpatented lands should revert. Section 4 provided that as soon as the company should file its maps designating the route the lands should be withdrawn from the market. Section 5 provided for the transportation of mails. Section 6 granted a right of way through the public lands 100 feet wide, with grounds *87 for station buildings and material for construction from the adjacent lands. Section 7 provided:
“ That the acceptance of the terms, conditions, and impositions of this act by the Kansas Valley road shall be signified in writing, * * * which acceptance shall be made within one year after the passage of this act, and not after-wards, and shall be deposited with the Secretary of the Interior.”
The foregoing sections relate to the grant of public lands exclusively in Kansas and have no relation to grants of lands within the Indian Territory.
The sections which relate to the construction of the road through the Territory dealt with lands not public lands at the time of the conditional grant. The four sections are so entirely different in scope and effect they are set forth verbatim in the footnote.[1]
*88 At the time of the approval of the granting act certain roads were being constructed in Kansas, viz: Atchison, Topeka & Santa Fe Railroad, the Leavenworth, Lawrence & Fort Gibson Railroad, the Union Pacific, Southern Branch Railroad (now the Missouri, Kansas & Tesas), and the Kansas & Neosho Valley Railroad. Plaintiff company, it was subsequently shown, was the first to reach the designated point on the southern boundary of Kansas and the consideration is rested upon the language that whichever company was the first to thus complete its road, the grant or promise of the lands became binding and irrevocable, subject to the conditions expressed in section 9. Meantime, the company had negotiated with and secured the consent of the Indian nations to the right of way through their lands, as required by section 8 of the granting act. Thereupon the company began the work of construction and completed its line to Denison, Tex., within the required time, and has since operated the line.
*89 At the time four Indian nations possessed and occupied the lands through which the road was authorized to be constructed, to wit: The Muskogee Nation, commonly known as the Creeks, the Cherokees, the Choctaws, and Chickasaws. These people were living on lands set apart to them as a permanent home under treaties with the United States. The Muskogee Nation (or Creeks) acquired title to their lands in the Indian Territory by treaty April 12, 1834, 7 Stat., 417. Their title was defined by the natural landmarks described in article 2. Their conveyance was by patent provided for by article 3, as follows:
“ The United States will grant a patent, in fee simple, to the Creek Nation of Indians for the land assigned said nation by this treaty or convention, whenever the same shall have been ratified by the President and Senate of the United States, and the right thus guaranteed by the United States shall be continued to said tribe of Indians so long as they shall exist as a nation and continue to occupy the country hereby assigned them.”
The Muskogees (or Creeks) received a patent to their lands August 11, 1852.
The Choctaw Nation went into the possession of their lands in the same Territory by virtue of a treaty with the United States, known as the Dancing Rabbit Creek treaty, dated September 30, 1830, 7 Stat., 332. Their possession was described by metes and bounds and was guaranteed to the Choctaws by article 2, as follows:
“ The United States under a grant specially to be made by the President of the United States shall cause to be issued to the Choctaw Nation a tract of country west of the Mississippi River in fee simple to them and their descendants to inure to them while they shall exist as a nation and live on it.”
Subsequently, March 23, 1842, the United States issued their patent to the Choctaw Nation in accordance with section 2 of the treaty between the parties. Subsequent to that time, January 17, 1837, the Choctaws and Chickasaws entered into “ articles of convention and agreement,” 11 Stat., 573. by article 1 of which it was provided:
“ It is agreed by the Choctaws that the Chickasaws shall have the privilege of forming a district within the limits of *90 their country, to be held on the same terms that the Choctaws now hold it, except the right of disposing of it, which is held in common with the Choctaws and Chickasaws, to be called the ‘ Chickasaw district of the Choctaw Nation.’ ”
Later, on June 22, 1855, another treaty was entered into between the United States and the Choctaw and Chickasaw Tribes, 11 Stat., 611, by which the boundaries of the Choctaw and Chickasaw country were defined and secured and guaranteed “ to the members of the Choctaw and Chickasaw Tribes, their heirs and successors, to be held in common ” and to “ revert to the United States if said Indians and their heirs become extinct or abandon the same.'1'’
The Chickasaws were removed to these lands by the United States. Beginning with the treaty between those people and the United States of October 20, 1832, 7 Stats., 382, known as the treaty of Pontitoc Creek, we find the initial steps taken for their removal. They went west seeking a permanent home, and it was so expressed to them by the Government. For a consideration the Chickasaw Nation ceded to the United States all the land which they owned in Mississippi. By a supplemental treaty proclaimed May 24, 1834, known as the treaty of Washington, the original treaty was modified with respect to the disposition of certain reservations in Mississippi, but the general scheme of removal was carried out. The tribe subsequently, in 1837, obtained title to land in the Choctaw country in pursuance of the original intent between the Chickasaws and the Government. The United States supervised and sanctioned the treaty between the Choctaws and the Chickasaws. The purpose then was unqualified as to any possibility of the removal of any of these people from the country where they were located west of the Mississippi.
The title of the Cherokees to the portion of their lands involved in this case was first acquired under treaty with the United States May 6, 1828, 7 Stat., 311. Article II was a guaranty to the Cherokees for possession forever of 7,000,000 acres of land. This guaranty was to “the Cherokees.” And in addition to the guaranty of 7,000,000 acres the United States further guaranteed “to the Cherokee Nation” a perpetual outlet west. On February 14, 1833, a *91 supplemental treaty was entered into whereby the United States reaffirmed the foregoing grant, 7 Stat., 414, and “ to possess the Cherokees, to guarantee to them forever the land therein described.” Subsequently, December 29, 1835, the treaty of New Echota was made with the Cherokees residing east of the Mississippi whereby the United States guaranteed and secured to be conveyed by patent the home tract and the outlet covenanting “to convey to the said Indians and their descendants by patent in fee simple an additional tract of land” describing a tract of 800,000 acres. By the third article of this treaty it was agreed that there should be included in one patent to be executed to the Cherokee Nation all the land mentioned according to the provisions of the act of May 28, 1830, 4 Stat., 411. This act was “An act to provide for an exchange of lands with the Indians residing in any of the States or Territories and for their removal west of the River Mississippi.” By section 3 of that act it was provided that—
“In the making of any such exchange or exchanges, it shall and may be lawful for the President solemnly to assure the tribe or nation with which the exchange is made, that the United States will forever secure and guarantee to them, and their heirs or successors, the country so exchanged with them; and, if they prefer it, that the United States will cause a patent or grant to be made and executed to them for the same: Provided always, That such lands shall revert to the United States if the Indians become extinct or abandon the same.”
By section 7:
“Provided, That nothing in this act contained shall be construed as authorizing or directing the violation of any existing treaty between the United States and any of the Indian tribes.”
On December 31, 1838, a patent was issued by the United States reciting provisions of the treaties of 1828, 1833, and 1835 in regard to the grants of such lands.
After the close of the war between the States treaties of amnesty between the United States and the tribes whose lands are here affected were proclaimed as follows, viz: With the Choctaws and Chickasaws, proclaimed with amendments July 10, 1886, 14 Stat., 769; with the Creeks, *92 proclaimed with amendments August 11, 1866, 14 Stat., 785; and with the Cherokees, imoclaimed August 11, 1866, 14 Stat., 799. In this latter treaty the amendments offered in the Senate were not accepted by the Indians until July 31, 1866. With the Creeks, the Choctaws, and Chickasaws the amendments were accepted in July, 1866.
Previous to the passage of the act under which plaintiff claims and subsequently, other acts had been passed for the construction of railroads .southward from Kansas. Under its original name of Union Pacific Kailroad Co., Southern Branch, it was granted lands by acts of Congress of March 3, 1863, July 1, 1864, and July 26, 1866. The first named of these acts was for the grant of land to the State of Kansas for aid in the construction of certain railroads, 12 Stat., 772. Among the railroads for whose benefit aid was granted by this act was a line extending from Atchison via Topeka through Kansas in the direction of Santa Fe, N. Mex., with a branch from where the road crossed the Neosho in Kansas down the valley of that name to a point where the railroad, also aided by said act, extended from Leavenworth in the direction of Galveston Bay, in Texas. This was the route substantially covered by the original charter. On July 2, 1864, Congress passed another act making additional grants of land in Kansas to aid in the construction of railways. On March 19, 1866, the Atchison, Topeka & Santa Fe Kailway and plaintiff entered into an agreement whereby the Atchison Co. assigned all its rights in and to the lands granted by the act of March 3, 1863, and of July 1, 1864, as to the line from Fort Biley down the Neosho Valley, and known as the Neosho Valley Branch. Then came the act of July 25, 1866, supra, and on July 26, 1866, Congress passed another act granting lands to the State of Kansas for the construction of the Southern Branch of the Union Pacific. .These lands so granted inured to the benefit of the plaintiff, and were, as alleged in the petition, parts of a general scheme and purpose, subject to the will of Congress, as I think, with respect to the outstanding claims of others.
These acts of Congress of March 3, 1863, 12 Stat., 772, July 1, 1864, 13 Stat., 339, and July 26, 1866, 14 Stat., 289, *93 granted lands which the Supreme Court construed to be acts in pari materia. Kansas City, Lawrence & Southern Kansas R. R. Co. v. Attorney General, 118 U. S., 682. There was no occasion for the appellate court to allude to the lands occupied and held under treaties between the Government and the Indians, because the present controversy had not then arisen. But all these acts and Indian treaties must be considered together in disposing of the issues here to determine the meaning and intent of Congress with respect to the lands which now form the subject matter of this controversy, because they were all under executive and legislate consideration at the same time.
In the exercise of the political power over the civilized tribes as wards of the Government, Congress provided for the appointment of a commission, known as the Dawes Commission, to enter into negotiations with the civilized tribes for the purpose of extinguishing the national or tribal title, either by cession of some part of the soil or by allotment and division among the Indians upon the acceptance by the Indians of the terms imposed. The national claim of title was superseded by the allotment of lands in severalty, and by subsequent legislation Congress declared “that the lands belonging to the Choctaw, Chickasaw, Cherokee, Creek, or Seminole Tribes upon the dissolution of said tribes shall not become public lands nor property of the United States, but shall be held in trust by the United States for the use and benefit of the Indians respectively comprising each of said tribes and their heirs.”
Pending the allotment of the lands in severalty the plaintiff company gave formal notice of its claim to the land by virtue of an act approved July 25, 1866. (14 Stat., 236.) It claimed that by the performance on its part of the conditions set forth in the act mentioned an express contract founded upon the said act had been created whereby the company had acquired the title in fee simple to the lands, subject only to the communal, possessory, or usufructuary rights then existing in the four nations in occupancy. It is contended that as the national tribal title of occupancy existing at the date of the grant became extinguished the company’s title took immediate effect by relation as of the *94 date of the alleged grant, and thereupon became entitled to patents.
As an alternative proposition to that alleging breach of an express contract it is further alleged that even if this proceeding “be treated as a mere suit to recover the value of lands owned by the claimant and taken by the United States, it is an action upon an implied contract and one based on the Constitution.” Thus, a grant in prmsenti of such character as to entitle the plaintiff to immediate possession, as well as to patents to the lands described in the petition, is claimed under and by virtue of alleged express covenants as well (it is further contended) on the implied promise of the Government to pay for the lands on demand, which has found expression in the present proceeding, for a money judgment against the United States.
The demurrer to the petition is made by counsel to raise two questions:
(1) Whether the claim is within the jurisdiction of the court under the provisions of the Tucker Act.
(2) Whether the petition sets forth a cause of action.
The law and the facts arising out of the allegations of the petition under the statutes and treaties affecting the issues are too intimately blended to deal separately with the matter of jurisdiction without going into the merits of the case so far as can be done properly on the demurrer.
There is authority for this course. Fauntelroy v. Lum, 210 U. S., 235. In Louisville Trust Co. v. Cormingor, 184 U. S., 26, the court declared that the power to hear and determine a subject matter was limited in such various ways in many cases the matter of jurisdiction might depend on the ascertainment of facts involving the merits, and in that sense courts could exercise jurisdiction in disposing of the preliminary inquiry, subject to correction on a review where jurisdiction was erroneously retained by an adjudication on the merits.
But plaintiff objects to the consideration of anything in the nature of extraneous matter and seeks to restrict consideration of the case as made by the petition.
The office of a demurrer should not be undermined by the use of testimony of a documentary character which, accord *95 ing to the rules of law, need to be properly authenticated, but public acts and treaties affecting the issue at any stage of the proceedings can not be excluded from consideration at any time.
Eliminating certain documentary evidence offered by defendants to qualify or contradict the statements of the complaint because not proper to be considered on demurrer, all acts of Congress relating to the alleged grant and all public treaties affecting the Indian right can now properly be considered. Judicial notice must be taken not only of the legislation treaty agreements and contracts with all parties affected, but all matters of public history must be taken into account. The averments and exhibits of the petition require the court to take an unrestricted view of practically everything material in any stage of the case.
The general jurisdiction of the Court of Claims conferred by the act of March 3, 1887, 24 Stat., 505, gives the court authority to hear and determine:
(1) All claims founded upon the Constitution; or, upon any law of Congress except for pensions.
(2) Those founded upon any regulation of an Executive Department.
(3) Or those founded upon any contract, expressed or implied, with the Government of the United States.
(4) Or for damages, liquidated or unliquidated, in cases not sounding in tort, in respect of which claims the party would be entitled to redress either in a court of law, equity, or admiralty, if the United States were suable.
For and against jurisdiction under the Tucker Act of 1887, 24 Stat., 505, a large number of authorities have been cited. In support of the demurrer defendants particularly rely upon the following: Langford's case, 12 C. Cls. R., 338, 101 U. S., 341; Bethlehem Steel Co. v. Same, 41 ib., 19, 205 U. S., 105; Hollister v. Benedict Mfg. Co., 113 ib., 59; United States v. Palmer, 128 ib., 262; Hill v. United States, 149 ib., 593; Schillinger v. Same, 155 ib., 163; United States v. Berdan Fire Arms Co., 156 ib., 552; Dooley v. Same, 182 ib., 222; Russell v. Same, 182 ib., 516; Bigby v. Same, 188 ib., 400; Harley v. Same, 198 ib., 229.
*96 In support of the sufficiency of the allegations of the petition plaintiff relies upon the following, viz: Brown v. United States, 6 C. Cls. R., 171; United States v. Curtner, 38 Fed. Rep., 1; Choctaw Nation v. United States, 119 U. S., 1 et seq.; United States v. Great Falls Mfg. Co., 112 U. S., 645; 16 C. Cls. R., 160; New York Indians v. United States, 170 U. S., 1 et seq.; United States v. Lynah, 188 U. S., 445; The Milliken Imprinting Co. v. United States, 40 C. Cls. R., 81; 202 U. S. 168; State of Kansas v. United States, 204 U. S., 331.
It would not be profitable to review the many cases relating to the jurisdiction under the Tucker Act of 1887. Several relating to the general jurisdiction of this court under the act mentioned, including a number of those cited by the respective counsel, were specifically considered in Lynah's ease, 188 U. S., 445. It is enough now to say that some of the cases relied on relate to express contracts and some to the right of the parties to recover upon the implied promise to pay; some are for the taking of land for public improvements, while others relate to compensation for the alleged appropriation of rights under patents, while there are yet other cases of a class presenting questions of a character quite different from the case at bar.
It is true, as said by some of the counsel, that the case here is so unique that there is nothing like it to be found in the books. Yet in many respects it is a case which can not be regarded as so unusual that precedents can not be found and applied.
There is no room for any alternative proposition as upon an implied contract. It is a rule of ancient pleading sanctioned in modern practice that parties can not be bound by implied promises when express contracts have been made as to the same subject matter. Chitty said that this proposition was certainly sound law unless the express contract be rescinded or abandoned. So, where an express written contract exists the complaining party must declare upon the written agreement so long as the special agreement remains in force, and under such circumstances such party can not recover upon a quantum meruit. The principle has met the approval of the Supreme Court when it declared the Chitty rule that implied promises in law exist only where there is *97 no express promise — expressum facit cessare tacitum. Hawkins v. United States, 96 U. S., 218.
Applying these principles, there is -no implied, contract, and the cause must stand on the alleged express agreement for whatever there may appear to be respecting a breach. If there is a breach, the action must only lie for that breach; but if there be no breach, no action will lie for the implied assumpsit until it be shown that the parties have either abandoned the express agreement or have so rescinded or modified it as to give rise to the necessary implication.
In Harley's case, 39 C. Cls., 114, Nott, Ch. J., said that implied contracts are of two kinds. The first is where a man has tortiously taken property and the owner waives the tort and sues in assumpsit. In such cases there is no meeting of minds. Such cases, said this court, rest upon the principle that if the owner chooses to waive the tort and sue for the money derived from his property in the defendant’s hands, the defendant can not set up his own unlawful conduct as a defense. The second kind of implied contracts, continued the writer of that opinion, “ is where the parties met and their meeting resulted in a wordless agreement.”
But this is a suit against the United States first upon an express contract and as an alternative upon an alleged implied agreement. The double method of proceeding is inconsistent. If there was an express contract founded upon a law in favor of the company, the plaintiff not only does not abandon it, but stands upon what it says is the express agreement. If there was no express contract, it is not apparent how the jurisdiction can be asserted for the taking of the lands claimed, inasmuch as the action is against the Government and there is no implied promise to pay; but, according to the petition, an express promise on the part of the Government to do so.
Individuals may sometimes waive a tort and sue in as-sumpsit, but where there is a tortious taking by the United States the wrong can not be so waived as to warrant an action under the provisions of the Tucker Act. In so far, then, as this action rests upon the alternative proposition asserted as upon an implied promise the jurisdiction is *98 wanting. Russell v. United States, 182 U. S., 530; Harley v. Same, supra, 198 U. S., 234.
As to the second kind of implied contracts where parties have met but their meeting resulted in a wordless agreement, there can be no room for the statement that jurisdiction can be maintained under plaintiff’s alternative proposition, because the company’s entire case comes back to the express agreement. It is that which must be enforced, if anything can be.
No clearer statement can be found relating to jurisdiction than that stated in United States v. Jones, 131 U. S., 16, where the court said that the circuit and district courts had concurrent jurisdiction, within certain limits as to amounts, to render judgments on money demands, but the power of those courts was no broader than the jurisdiction of the Court of Claims to render judgments for the larger amounts of which this court has jurisdiction; and that “ claims redressible in a court of law, equity, or admiralty may be claims for money only,'or they may be claims for property for specific relief, according as the context of the statute may require or allow.” Other cases practically repeat this phase of the matter under the provisions of the Tucker Act, viz: United States v. Behan, 110 U. S., 338; United States v. Great Falls Mfg. Co., 112 ib., 645; Hollister v. Benedict, 113 ib., 67.
If, then, plaintiff’s title became complete by the lawful merger of the Indian title with such reversionary interest as the railroad acquired from the United States — that is, if divesting the Government of all its interest in the lands by the act of July 25, 1866, the United States lawfully extinguished the Indian titles and also converted the land now claimed into the public domain of the Government— the railroad interest became vested and there arose a breach of an express contract for the value of the land for which a judgment sounding in damages for money can be entered.
No question of tort is involved under the provisions of the Tucker Act if full and complete title became vested in the railroad by contract; or, in other words, if the railroad acquired such a title that the lands became a property right which the company could assert by due process of law at *99 the time of the filing of the petition. There is thus presented the broad question as to whether the claim of the plaintiff be justiciable, linked as this question necessarily is with the intent of Congress in the passage of the act upon which the claim of title is predicated and with the constitutional power and authority of Congress to make the allotments and reservations as appears to have been done. Assuming that the Government parted with its fee, the question is whether there was not yet left the transcendent power of the legislature to carry out contemporaneous obligations with others.
It is well to observe here that a claim against the United States for a specific amount of money which is not expressly or by necessary implication authorized by a valid enactment of Congress can not be said to be founded on the Constitution. Hooe v. United States, 218 U. S., 322. And where the United States have not acknowledged any right of property in a petitioner the case is one sounding in tort, of which this court has no jurisdiction under the act of March 3, 1887. Hill v. United States, 149 U. S., 593.
By the Constitution Congress became invested with the power to deal with the Indian tribes, and the question arises whether the courts can deny the validity of acts of Congress where, pursuant to treaties in existence at the time of the passage of the alleged granting act, the legislative body undertook to carry out the provisions of those treaties for the benefit of the then occupants of the lands. In other words, can it be said that the claim of the plaintiff is justiciable?
When the company proves, if it can prove, that the conditions imposed by the act of July 25, 1866, have happened there is jurisdiction to proceed as for a breach. The fulfillment of the conditions of the grant sufficiently acknowledges on the part of the United States plaintiff’s right of property created by the grant, but otherwise not.
Here the Government does not claim to own the fee to the lands or to have any interest in them, and in this respect the matter of tort is unlike Langford's case, 101 U. S., 341, and unlike Hill v. United States, 149 U. S., 593. The rule dedueible from these and other cases was stated in the *100 leading case of United States v. Lynah, supra, where the court said that “if an officer of the Government takes possession of property under the claim that it belongs to the Government (when in fact it does not), that may well be considered a tortious act on his part,” for the reason that there could be no implication of an intent on the part of the Government to pay for that which it claims to own. In the present case the strong arm of the Government has been interposed for the protection of the wards of the Nation and to carry out treaty rights contemporaneously made with the grant to the railroad (previously as well), conceding rights to the occupants of the land. This statement brings us to the allegations respecting the course of the Government in making the allotments, and reserving by its other legislation other lands for the benefit of the occupants and the refusal of the defendants to nSake the lands public lands of the United States.
This phase of the matter will be understood more clearly after considering the terms of the grant and the existing treaties together. The suggestion in its nature is jurisdictional, to be sure, but does not involve defendants in anything tortious unless it be shown that the Government had no power to execute its treaties because of the grant.
All parties are agreed that section 9 is the vital section.
Plaintiff’s contention is that upon the transfer of the tribal title to the members of the tribe the nations lost their interest in the lands and the individual occupants acquired none, but that the railroad acquired a complete title. By relation is meant an act done at one time operating upon the thing as if done at another time. The authorities hold that the doctrine iá a fiction of law for the promotion of justice and of the lawful intention of the par-ties by giving effect to acts or instruments which, without it, would be invalid. We are thus brought to two crucial questions; that is, as to the intent of Congress in the passage of the act, and, next, as to the proper construction to be given to the act itself.
The civilized tribes had forfeited no rights secured to them by previous treaties because of their participation in the war which had just ended. It is true that the majority of the occupants of the land had, in the war between the *101 States, taken up arms against the Government, but many of these occupants did not do so. ' It is historical that many occupants of the lands had during the war gone northward, but returned after the close of hostilities. But none of the occupants of the lands were hostile in 1868, and the evidence of this is that by new treaties rights acquired under former treaties were affirmed in July, 1866, upon certain conditions relating to the former slaves of the tribes, to whom property (as well as political) rights were given. The scope and effect of these new treaties was to put the world on notice that Government authority would continue to be exercised over permanent occupation of all lands not taken over absolutely at that time in virtue of the new treaties by the United States. Amnesty was extended to every participant in the struggle of the sections. None of these treaties meant forfeiture of previous Government obligation or Government interference with rights acquired under outstanding patents promised or granted by previous treaties.
The granting section carries words of absolute donation, with something following to limit the grant. Railroad Co. v. Smith, 9 Wall., 95; Schulenberg v. Harriman, 21 Ib., 60; Leavenworth R. R. Co. v. United States, 92 U. S., 733. The language implied present conveyance of the fee but subject to conditions liable never to happen. That is, the Indian title had to be extinguished and the lands had to become public lands, but nothing attached to any of the alternate sections until there was a survey of the lands as a part of the public domain of the United States, the road having been located. But, as said in the case of Rice v. Railroad Co., 1 Black, 380, and repeated in the Leavenworth case, supra, the grant embraced such lands as could be sold and enjoyed and not those which the Indians, pursuant to treaty stipulations, were left free to occupy.
When learned counsel say it is immaterial whether the railroad claim be a grant in prcesenti, or a grant in futuro, by what name the grant be called, the concession would seem to follow that the granting act on its face involved contingencies too indefinite to have constituted a present or prospective transfer perfect enough' to be called a statutory *102 grant of an interest. Whilst contending that the railroad acquired the reversionary interest of the United States they appeal to the rules of the common law, citing 2 Blackstone, c. 2, where the commentator says:
“An estate in reversion is the residue of an estate left in the grantor, to commence in possession after the determination of some particular estate granted out by him. Sir Edward Coke describes a reversion to be the returning of land to the grantor or his heirs after the grant is over.”
When this act was passed the Government had already agreed never to assert the residue of any estate for itself so long as the occupants observed their treaties by remaining in possession.
But the learned commentator also says that “ The fee simple of all lands must abide somewhere”; and that “A reversion is never created by deed or writing, but arises from construction of law.” In Wallach v. Van Riswick, 92 U. S., 212, the Supreme Court recognized the common-law rule that a fee can not be in abeyance, though the reasons the court said were not to be of universal application because a common-law maxim must yield to statutory provisions inconsistent with the rule. Is there, then, anything in this alleged statutory contract inconsistent with the rule ?
The act on its face only purported to grant the naked fee clouded by conditions and qualified by terms which left the grantor free to carry out the previous (and also contemporaneous) pledges of the Government to those already occupying the lands. The Government did not in the passage of the act divest itself of control. If it did, then the grantee had the better and superior right to assume control. The manner, time, and conditions of extinguishing the right of occupancy were exclusively matters for the consideration of the Government and could not be interfered with nor put in contest by private parties. Buttz v. Northern Pacific Railroad, 119 U. S., 55.
If the conveyance of the reversionary interest operated as a present grant of the fee, then there was presented the anomaly of the remainderman asserting ownership, with the power reserved by the grantor not only to remain in present control but in control for all time as well, for the *103 want of a promise to ever determine the period of existence of the particular estate. When conditions were annexed to this act by which the grantor could exercise the option of never determining the duration of the particular estate, the remainder attempted to be created or acquired is quite unlike those cases where the particular estate is given for the life of a person with remainder to another; or those cases where' two persons hold the precedent estate as tenants for their joint lives remainder over to the survivor in fee. Freeholds in some of the States may commence in futuro, by deed or will, with or without the intervention of a precedent estate; but here the grant of the reversionary interest of the United States does not appear to have been the disposition of an estate in remainder, because an estate in remainder can not commence in futuro. The question then arises whether the sovereign power possessing the fee by retaining the right to render its conveyance of that fee nugatory and of no avail to the grantee because of agreements with others did not create such a float as to keep the fee in that kind of abeyance as to amount to no grant at all. The intangible and unenforcible right appeared to be in the railroad (indefinitely suspended), but the right of control and ultimate disposition remained with the sovereign for the benefit of those in possession whose title was as sacred as the fee itself.
This part of the discussion may be unnecessary and as beside the questions arising as to the happening of the condi- ' tions imposed.
But the nature of the alleged grant derives its preliminary ' importance from the character of the estate implied by the language of the granting act. In Doe v. Considine, 6 Wall., 476, the Supreme Court quoted with approval the rule as to when a remainder vested and said:
“ Where a remainder is limited to take effect in possession, if ever, immediately upon the determination of a particular estate, which estate is to determine by an event that must unavoidably happen by the effkix of time, the remainder vests as soon as the remainderman is in esse and ascertained, provided, etc.”
In the case at bar the Indian estate could not be determined (according to the Supreme Court) except by a voluntary *104 cession of the land, or by abandonment (thereby surrendering the benefit of treaty rights), or except by the arbitrary exercise of the power of Congress. As the sovereign annexed conditions to the grant before the railroad title could become perfect, and these conditions could only happen by the destruction of outstanding treaty obligations with the occupants, the interest acquired by the railroad under the rule stated can not be said to have become vested. There was an absence of any covenant that the particular estate would ever terminate. How and when was this event, the determination of this particular estate, unavoidably to happen if the obstacles interposed by the treaties and by the language of the grant left it in doubt whether the event could happen at all so as to vest any title in the railroad? The Supreme Court has declared in Doe v. Considine, 6 Wall., supra, that estates in abeyance' were never favored, thereby standing upon the common-law rule.
Parenthetically, the railroad can hardly claim that the Government plea of the Indian right is wanting in that exalted morality which the railroad claims for itself. While it is true that governments may break treaties and that our own Government has occasionally exercised the right to terminate protocols and like obligations with foreign governments as well as with our domestic tribes, the political power never does so except for the best of reasons and for causes plainly declared in unambiguous language. There are no instances where governments promise to break treaties; otherwise they would not be made.
The established rule of construction is that where there is uncertainty of the right of enjoyment the remainder is a contingent and not a vested remainder. While the Supreme Court in Kansas v. United States, 204 U. S., 331, dealt solely with the question of the original jurisdiction of the appellate tribunal in a case involving these very lands, there is contained in the opinion of that court the statement that if the allotments made to the individuals of these tribes should be taken from them (as a part of the relief sought by the bill then before the court) the United States would be subject to a demand from them for the value of the lands taken or for other lands involved. It is plain, then, that *105 there was, even from the'railroad point of view, uncertainty arising on the face of the act under which the grant is claimed as to which had the better right of enjoyment of the lands. With possession and the right of possession under treaty with the United States and properly claiming as individuals the heritable right of enjoyment until in the course of nature the individual beneficiaries became extinct or abandoned the use, a clear case is presented when we say there was enough uncertainty of the right to enjoy the benefit of the lands on the part of the railroad that no such estate vested in this plaintiff as the company can now assert.
There are cases where out of the terms of an express contract an implied obligation arises and becomes part of the contract itself. For example, in every lease there is, unless excluded by the operation of some express covenant or agreement, an implied obligation on the part of the lessee to so use the property as not unnecessarily to injure it. Obligations implied against citizens will be implied against the United States, but the circumstances must be the same, United States v. Bostwick, 94 U. S., 58. The principle also obtains that if a precedent act is to be performed at a certain time or -place and a strict performance of it is prevented by the absence of the party who has a right to claim it, nonperformance of the condition can not be pleaded. Williams v. Bank, 2 Pet., 76. But to say that the language used in the act of July 25,1866, raised an implied obligation on the part of the Government to extinguish titles and make the lands public lands for the benefit of this railroad is also to say that Congress committed the Government to a gross breach of public faith with the occupants of the lands at the time of the passage of the act. The Government did not do that. There was no pledge given by the United States by this grant as in Buttz v. Northern Pacific R. R., 119 U. S., 57, where it appeared that there was a stipulation for extinguishment and the Sioux had retired from the lands by agreement with the United States. The circumstances are too essentially different for any court to say that an implied contract could possibly grow out of language designed to prevent the contention for the thing now asserted.
*106 There ought to be in this day and time no room for misunderstanding as to the nature of Indian titles. Beginning with the case of Johnson v. McIntosh, 8 Wheat., 543, and sustained by a long course of decision the principle is well established that the aboriginal title by virtue of occupancy became as sacred as the fee of the United Statesthat the Indian right of occupation has always been heritable but inalienable; and when abandoned by the occupants, possession attached itself to the fee. United States v. Cook, 19 Wall., 593; Jones v. Meehan, 175 U. S., 1; United States v. Winans, 198 Ib., 373.
This heritable and sacred right has from time to time been emphasized by the policy of the Government in making treaties with aboriginal occupants. The primitive control of the uses made of these lands passed by the treaties with the civilized tribes from the communal owners and became lodged in the government of the nations for the use of their members.
In Holden v. Joy, 17 Wall., 211, the court said that it was not important as between the parties in that case whether the title in dispute “ was a fee simple or an Indian title of occupancy or some other title,” but that the Indian tribes were capable of talcing as owners in fee simple lands by purchase where the United States in form, for a valuable and declared consideration, sold such land to them. Considering that the civilized tribes yielded their possessions east of the Mississippi River for lands which they now occupy under treaties with the United States guaranteeing possession of the lands so occupied at the present time, the consideration was given because the treaties declared a consideration.
In Leavenworth R. R. v. United States, 92 U. S., 733, the court said that upon every principle of natural right lands dedicated to the Indian use should be carefully guarded by the Government and saved from a possible grant, and that “ as the transfer of any part of an Indian reservation secured by treaty would involve a gross breach of public faith the presumption is conclusive that Congress never meant to grant it:”
In Slidell v. Grandjean, 111 U. S., 437, the court declared that as nothing could be inferred against the State, *107 tbat construction should be adopted which will support the Government rather than the individual if there be doubt as to the meaning of the terms of the statute granting public property to an individual. The court also thought the rule to be wise because such a rule serves to defeat any purpose concealed by the skillful use of the terms to accomplish something not apparent on the face of the act. Whether, in the present case, the agents of the railroad procured the passage of the act under which the claim is made or not, we still have before us the further opinion of the Supreme Court that acts granting public property are usually drawn by interested parties, who are presumed to claim all they are entitled to.
In Cherokee Nation v. Kansas Ry. Co., 135 U. S., 656, the court valued tribal patents from the United States as the equivalent of holding the lands in fee simple, saying that the lands of the Cherokee Nation, like lands held by private owners everywhere within the geographical limits of the United States, were held subject to the authority of the General Government in the exercise of the right of eminent domain to take them for such objects as were germane to the execution of the powers granted to it, provided only that the lands were not taken without just compensation being made to the owner.
The statutes of the Cherokees, for example, afforded evidence of a status, by virtue of treaties, somewhat different from the rights enjoyed by the aboriginal occupants. While the title to the lands passed from the communal owners and became lodged in the Indian governments for the use of the members of the tribe, these statutes were adopted under treaties for the better government of the individual Indians through the agencies of their own governments. In affirming this court in the case of Journeycake, 28 C. Cls. R., 302; 155 U. S., 206, the Supreme Court referred to the lands patented to the Cherokee Nation and said that the millions of acres of land appropriately styled common property of the Cherokee Nation and known as its public domain belonged to the Cherokees as a nation and that “ the public domain of the Cherokee Nation is analogous to the public lands of the United States or the demesne lands of the *108 crown, held absolutely by the Cherokee Government, as all property is held, a trust for governmental purposes and to promote the general welfare.”
In the case of The Delawares, 38 C. Cls. R,., 249, which was affirmed by the Supreme Court, it was said by this court that the Cherokee Nation, in the policy of their national development, had granted a fee simple in one part of their country as to the rights of those members of the tribe desiring a change of their habitat and to another, depending on the location of the grant, a different tenure of right or estate, and that they were within the terms of one grant and omitted as to the other.
In Spaulding v. Chandler, 160 U. S., 406, the Supreme Court referred to certain orders relating to an Indian reserve and declared that the operation of those orders was clearly postponed until after the extinguishment of the reserve either by a voluntary cession to the Government, a cession or abandonment of the use, or the arbitrary exercise by Congress of its power to appropriate the lands. I am not unmindful of the case of Fleming v. McCurtain, 215 U. S., 56, where it was decided that a treaty conveying a tract to the Choctaw Indians in fee simple to them and their descendents was a grant to the Choctaw Nation only; and that it did not create a trust for the individuals then comprising the nation and their respective descendants. In that case, however, it was made to appear that plaintiffs did not claim under any title to be derived from the statute providing for distribution according to the rolls of citizenship, nor did the bill attempt to bring plaintiffs within any grant later than the treaty and patent discussed by the court.
In the case at bar Congress manifested a clear purpose to abide by its treaties with the occupants of these lands at the time of the passage of the act of July 25, 1866. Taking the occurrences altogether, the purpose was made plain that there was no intent to take advantage of any of the tribes. The proof of this intent is found in that requirement that before the railroad company could secure even the right of way through the lands from the Kansas line to the Texas border the consent of the occupants had first to be obtained unless the government reserved the right to grant *109 by previous treaty. It would be a violent assumption to bold from the language of the act and from the circumstances surrounding, its passage that Congress would impose the requirement on the railroad to obtain the Indian privilege of building and then, by another section, leave open the right of the company to take possession of every alternate section for a distance of 243 miles without the consent of the tribes who had become possessors of the soil with such a title as the Government was recognizing to be as sacred as the fee.
In reassuming the obligations of previous treaties with the Cherokees and the other three tribes contemporaneous with the passage of the alleged grant to the railroad, Congress manifested a clear pui'pose to grant nothing except by the consent of the tribes.
Thus, by Article XI of the new treaty with the Cherokee Nation the United States stipulated that the road when built and operated should be subject to the Indian trade and intercourse laws, and by the treaty itself the concession of the Cherokees only embraced a right of way not exceeding 200 feet wide except at stations, switches, water stations, or river crossings, where more land might be indispensable, and then only 200 feet additional was provided to be taken if reserved by treaty, and by consent if not.
By the new treaty with the Choctaws and Chickasaws the United States also stipulated for a right of way through their lands to any company or companies authorized by Congress to undertake to construct roads through those nations, and when constructed such railroads were to be sub-' ject to the laws relating to intercourse with Indian tribes.
The United States by its new treaty with the Creek Nation stipulated for the right of way through their lands to any company duly authorized by Congress, but subjecting the road and its employees, as in the other cases, to the laws relating to intercourse with the Indian tribes.
By section 8 of the act of July 25, 1866, this Kansas & Neosho Valley Bailway was authorized to extend and construct its road as stated in the petition with right of way through the Indian Territory wherever such right is now *110 reserved or may hereafter be reserved to the United States by treaty with the Indian tribes to the same extent as granted by the sixth section of the granting act through the public lands; and in all cases where the right of way should not be reserved to the Government the said company should before constructing its road secure the consent of the tribes in interest. Evidently the language of this section 8 was incorporated in the granting act to carry out the terms provided for by the new treaties with the occupants of the lands. Accordingly, these treaties must be taken in pari materia with the granting act because they were all under consideration by Congress at the same time and related to the same subject matter. No other view can be taken, because by section 10 of the granting act of 1866-it was declared :
“That said Kansas City & Neosho Valley Railroad Company, its successors and assigns, shall have the right to negotiate with and acquire from any Indian nation or tribe authorized by the United States to dispose of lands for railroad purposes, and from any other nation or tribe of Indians through whose lands said railroad may pass, subject to the approval of the President of the United States, or from any company or parties incorporated or authorized for such purposes, by such nation or tribe, or which such Parties may have acquired under the laws of the United tates.”
The United States by its new treaty with the Cherokees in article 20 provided that whenever the Cherokee National Council should request it the Secretary of the Interior should cause the country reserved for the Cberokees to be surveyed and allotted among them at the expense of the United States.
By its new treaty with the Chickasaws and Choctaws it was provided in section 2 of article 1 that the lands occupied by those treaties, as described in the treaty of 1855, were held in common, that it would promote the civilization of said nations, and be to their best interests to have their lands allotted to individual members of the tribe in sever-alty. It was further provided by articles 11 to 36, inclusive, that their lands should be allotted in severalty and surveys *111 made in the same manner that public lands of the United States were surveyed. Article 33 provided:
“ All lands selected as herein provided shall thereafter be held in severalty by the respective parties, and the unselected lands shall be the common property of the Choctaw and Chickasaw Nations in their corporate capacities, subject to the joint control of their legislative authorities.”
In Minnesota v. Hitchcock, 185 U. S., 402, the Supreme Court alluded to allotments made in severalty and as containing something attempted more than a provision for the material wants of the Indians and declared it to be a duty for the Government “to secure to the Indians all that by any fair construction of treaty or statute can be held to have been understood by them or intended by Congress.”
It is impossible to resist the conclusion that there was nothing in the nature of an absolute grant to the plaintiff company creating contractual rights or to believe that the Government bound itself to extinguish the Indian title or to make their lands a part of the public domain of the United States.
How can it be said in view of the language of these treaties that there was any promise to any railroad to break other obligations for the benefit of a private company acquiring large bodies of land elsewhere and building roads to join with those being built in Texas northward?
But while the railroad admits that its title is derived from the ninth section of the act of July 25, 1866, counsel also contend that section 11 is fundamental and established the consideration for the grant or promise contained in section 9, which, when duly performed, made the grant or promise binding and irrevocably freed from any other conditions or restrictions than those contained in section 9. They deny that the proviso in section 1 applies to the language of the grant claimed under section 9 declaring that the reference in section 1 relates to the area of the grant alone. But the area is definitely fixed by section 9 “ not to exceed the ratio per mile granted in the first section of this act.” The proviso to section 1 is as follows:
“ Provided, That any and all lands heretofore reserved to the United States by any act of Congress, or in any other *112 manner by competent authority, for the purpose of aiding in any object of internal improvement or other purpose whatever, be, and the same are hereby, reserved and excepted from the operation of this act, except so far as it may be found necessary to locate the route of said road through said reserved lands, in which case a right of way 200 feet in width is hereby granted, subject to the approval of the President of the United States.”
As all the lands in the Indian Territory had already been reserved to the occupants, and that, too, by treaty, there was nothing upon which section 9 could operate until the Indian title would be extinguished and likewise until the land became a part of the public- lands. On this point I think the contention of the Government is sound. The reference in section 9 can not be made to apply to a single part or portion, but must be applied as far as possible to section 1 in its entirety, including each and every proviso forming a part of section 1. Taking the two sections and construing them together in the light of the treaty obligations assumed by the United States to the occupants, the purpose of Congress in incorporating the reference in section 9 was to throw around these occupants additional safeguards for their continued, permanent use of the lands, and were designed to exclude the construction of the terms of the alleged grant for which the plaintiff company is now contending.
The exception created by the proviso of section 9 is practically claimed to be without meaning, if the statement be true that by the doctrine of relation the title acquired by the grant became specific and related back to the date of the grant when the road was located and built and surveyed. The effect "of this argument, if true, would be to wipe out the two conditions.
Again, it is contended that the extinguishment of the Indian title made the lands part of the public lands of the United States. If so, what would be the occasion for the use of the second condition as a separate proposition ?
The title of an act can not be used to extend or to restrain any positive provisions contained in the body of an act. The title is only useful when the meaning of statutory provisions be doubtful and even then is of little weight. Hadden v. The Collector, 5 Wall., 107; Goodlett v. Louisville *113 Ky. Co., 122 U. S., 391. Ambiguity must be in the context and not in the title. United States v. Oregon Co., 164 U. S., 526. The title of the act before us providing for the extension of the road to Eed Eiver would apply as well to the grant of lands in Kansas to the railroad as to the grant claimed through the Indian Territory.
Considering the obligations of the treaties and their scope, that the real interest in the lands as a permanent home had been conferred upon the individual occupants; that the organized national tribal governments held the patents for the actual use of the memberships of the four nations, the purpose of the United States was at the time of the passage of the act of July 25, 1866, as reasonably certain as when but recently the Supreme Court decided that by the act of April 26, 1906, 34 Stat., 137, Congress had not released control over the lands occupied by one of these tribes (the other three being on the same footing), notwithstanding the bestowal of citizenship upon the individuals. Tiger v. Western Investment Co., 221 U. S., 287. By the allotments there was no such extinguishment of the title of the beneficiaries in the occupancy of the lands as will permit plaintilf now to be heard to say that the first condition of the act of July 25, 1866, has been met. The subsequent legislation of Congress relating to these titles, and which counsel say can not affect the case, not only can but must be considered to assist in the interpretation of the prior legislation — a rule which the court must follow, as the Supreme Court has said in the last case cited.
The second condition set forth in the act of July 25, 1866, is of equally large import. Before this grant could take effect the lands asserted under the grant had to become public lands. But it is argued that “nothing can be clearer” than that Congress meant in the act of July 25, 1866, that when the tribal Indian title was extinguished, nothing else having supervened, the lands would be public lands of the United States, and that nothing else ever did supervene; and that in fact they were, immediately upon the extin-guishment of the Indian title, used as public lands, subject to the uncontrolled exercise of the absolute power of the United States. But this uncontrolled and absolute power of *114 disposition was for the use of the real beneficiaries of the title in furtherance of' the preexisting treaty agreements. The lands were neither used as public lands of the United States nor ever expected to be opened to the public. All the people have an interest in the public lands of the United States. They are held in trust for the people of the whole country. United States v. Trinidad Coal Co., 137 U. S., 170.
The Government exercised the conceded power by virtue of the relation of the United States to the four tribes in their corporate capacity to convert the national tribal title to the use of the individuals of the tribes. The United States thereby abrogated the relation involved in the national or tribal holding in favor of the original beneficiaries. It has already been pointed out that the lands comprise the national domain of the tribes in their corporate capacity. It was corporate property of the Indian governments limited to uses of the individuals which made those governments a necessity for the welfare of the Individual occupants.
If, for the sake of the argument, it be conceded that the Indian title was extinguished, it does not follow that the lands did thereby become public lands, because the extin-guishment of the tribal title and the lands becoming public lands are not synonomous terms. The soil was not subject to absolute disposal of the United States without ignoring treaty rights which the occupants never supposed they could be called on to surrender. The condition that the lands should first become public lands is a separate and independent condition with but one meaning. To become public lands within the meaning of the act of July 25, 1866, the Government would have had to exclude the occupants from the alternate sections claimed under the grant and open these lands to public entry. That result was clearly never contemplated, because Congress knew and claimant also knew that there were outstanding patent rights which Congress reserved to deal with according to exigencies of public policy for the interests of the individuals of the nations who held the patents. These patents were in the nature of quitclaims of the United States subject to the rights of *115 third parties bolding prior claims to the lands, but to no others.
It is claimed that at the time of the alleged grant there was in force an act passed in 1864, 13 Stat., 41; sec. 2115, R. S., which provided that:
“ Whenever it becomes necessary to survey any Indian or other reservations, or any lands, the same shall be surveyed under the direction and control of the General Land Office, and as nearly as may be in conformity to the rules and regulations under which other public lands are surveyed.”
This statute does not specifically declare that the lands patented to the civilized tribes were public lands of the United States. Public lands are subject to preemption. These lands were not. The allotments certainly were not. The proceeds of the lands not needed for allotments were reserved for the occupants pursuant to the higher obligations stated.
The requirement of the proviso that the grant was not complete until these patented' lands to the Indian occupants were made public lands of the United States was a legislative declaration and absolute notice that they were not public lands when the granting act was passed, but had to become so, if at all, by subsequent legislation.
While learned counsel contend that it will not do to apply the ordinary technical rules and definitions found in other cases involving public lands to a case like this, they also concede that the use of the phrase “public lands” is not governed by an ironclad and inflexible definition, but that it depends upon the facts of each particular case. In Union Pacific Co. v. Harris et al., 215 U. S., 386, the Supreme Court said:
“What is meant by ‘public lands’ is well settled. As stated in Newhall v. Sanger, 92 U. S., 763, ‘The words “public lands” are habitually used in our legislation to describe such as are subject to sale or other disposal under general law.’ ”
That case also recited that if in any given case the words are used in a different meaning it should be apparent either from the context or from the circumstances attending the legislation; and “while the power of Congress over lands *116 which an individual is seeking to acquire under either the preemption or the homestead law remains until by the payment of the full purchase price required by the former law or the full occupation prescribed by the latter, yet under the general land laws of the United States one who, having made an entry, is in actual occupation under the preemption or homestead law can not be dispossessed of his priority at the instance of any individual,” citing Hastings v. Whitney, 132 U. S., 363, 364. If, then, “ one who has taken land under the preemption or homestead law acquires an equity of which he can not be deprived by any individual under the like laws,” how much stronger is the case át bar where there was not only an equity arising out of the considerations which took the occupants from their old homes east of the Mississippi Eiver to their new domiciles in the West, but an agreement based upon treaty which operated to prevent any grant interfering with the rights thus acquired. In Bardon v. Northern Pacific R. R. Co., 145 U. S., 538, public land was defined to be such land as is open to sale or other disposition under general laws. It is not doubted that the United States had power to trample upon its treaty obligations and make the lands of the civilized tribes a part of the public domain of the Government, but there was every in-tendment to the contrary by the long series of treaties made with these occupants, and finally a complete settlement of the question by the action of Congress in continuing the use of these lands according to the spirit of the treaties. In Barker v. Harvey, 181 U. S., 490, it was distinctly enunciated that lands burdened with a right of permanent occupancy were not a part of the public domain subject to full disposal by the United States. In Missouri, Kansas & Texas Ry. Co. v. Roberts, 152 U. S., 119, it was said that if the reservation there named was intended as a grant * * * it could only apply to such lands as were public lands, for no other lands in our land system are subdivided into sections, nor could it embrace lands which had been set apart and reserved by statute or treaty with them for the use of the Indians, as was the case with the lands in this controversy.
It is insisted finally that the conditions precedent can not be insisted upon to defeat the railroad claim (if it be *117 held that the Indian title has not been extinguished or that the lands have not become public lands), because of the rule that no party to a contract can insist on the fulfillment of a condition, the happening or execution of which it renders impossible.
There are cases of private right where it appears that if a party to a contract who is entitled to the benefit of a condition upon the performance of which responsibility is to arise dispense with or, by act of his own, prevent the performance, the opposite party is excused from proving a strict compliance with the condition. These cases, however, rest upon contracts containing covenants by the grantor to bring about the event on the happening of which his obligation depends or covenants necessarily implied from the terms of the agreements of the parties.'
It does not follow that this statutory grant, if it be considered as a grant at all, can be construed as comprising a covenant “that after a reasonable time the Indian title” should be extinguished, or that the lands should become public lands so far as necessary to effectuate the grant. The proposition of learned counsel that the granting act contains implied covenants of any such character is a mistake. The Government did not disable itself by the grant from keeping the occupants and their descendants on the land at will. The treaties provided that the United States could do that very thing. Congress did not intend, and by the terms of the granting act did not surrender the constitutional power of the Government to maintain the occupancy of those in possession. With notice of contemporaneous action providing for such dealing with the land as made it a matter of doubt whether the statutory grant could ever be effectuated, it is but fair to say that the railroad was neither misled nor deceived; that the railroad interest knew that the claim of the road was too remote and uncertain for purposes of credit at any time, and that the road would be built, and was expected to be built, by the aid of its grants of land elsewhere. It is reasonable to assume, considering the situation and the conditions imposed, that the agents of the company took chances as to the ultimate action of the Government.
*118 After everything is said relating to this grant, with its attendant conditions, we come back to the jurisdictional phase of the matter, because the legislation of Congress providing for perpetual Indian uses of the lands renews the question of the power of the court to proceed. Especially is there presented the right of the court to proceed because of the act approved April 28, 1906, 34 Stat., 137.
Section 27 of that act provides that the lands belonging to the four tribes shall not become public lands, but shall be held in trust by the United States for the use and benefit of the members. All acts inconsistent with this section being expressly repealed, can it be said that the claim is justiciable ?
There is no middle ground to take as between the contention of learned counsel for the railroad that the allotment proceedings beginning with the creation of the Dawes Commission and closing with the act last mentioned (including several intermediate acts) are acts of outright repudiation or are statutes which Congress had the power to enact and the President to approve.
Congress may not break the contracts of the Government where rights have become vested. On the other hand, the discharge of political duties intrusted by the Constitution to the political departments of the Government can not be the proper subject of'complaint by an appeal to the courts.
Underlying all the subsequent legislation leading up to the act last mentioned (which in itself is a legislative construction of direct application in the dispute relating to the nature of the grant in this cause) are treaties between this Government as the sovereign and the four nations of red men. While the construction of treaties is the province of the judiciary, and certain rights under treaties can not be affected by legislation, cases arising under treaties of a purely political character may be the subject of legislative action. In Reichart v. Felps, 6 Wall., 160, it was held that patents of the United States for land which it had previously granted, reserved from sale, or appropriated are void. At the time of this grant the plenary power of the legislative body was ample-to determine that patents other than those being confirmed for Indian uses might issue and *119 that such patents should not he void. The law-making authority could arbitrarily at that time have exercised the legislative prerogative of granting the full title to this railroad with no conditions of any kind annexed. Congress, however, did not choose to pursue this course, but gave the people in possession to understand by contemporaneous treaty agreement that their possession would never be disturbed except by consent. In Jones v. Meehan, 175 U. S., 1, where a reservation was neither identified nor surveyed, but provided to be located in the future, it was held by the court to have been converted into reserve sections of individual property by treaty. In the case before the court the same conditions were contemplated from the outset.
The history of the Government’s dealings with the property in controversy shows that these lands were reserved from the beginning from the public lands which were to be sold, and that from the time the occupants were put upon these reservations it was never intended that any part of that country should be sold as public lands. The lands were patented to organized civil tribal governments created by direction of Congress pursuant to a great public policy for the benefit of the coming generations of individuals of a class. The patents rested on treaties made with tribal governments as agencies for the individuals in interest. In every treaty and by repeated declaration of intention the Government committed itself to the policy of maintaining and protecting the full membership in their posession.' Property 'of these tribes was withdrawn from the operation of state laws. It was not the subject of taxation so long as tribal organization continued to be recognized by the political department. The Kansas Indians, 5 Wall., 73. When the treaty-making system with domestic Indians was abandoned in 1871 Congress provided (sec. 2079, E. S.) that “ no obligation of any treaty lawfully made and ratified with any such Indian nation or tribe prior to March 3, 1871, shall be hereby invalidated or impaired.”
As with treaties made with foreign nations, Chinese Exclusion case, 130 U. S., 600, the legislative power has the right to pass laws in conflict with treaties made with the Indians. Lone Wolf v. Hitchcock, 187 U. S., 553. But *120 as said in Stephens v. Cherokee Nation, 174 U. S., 483, and in Choctaw Nation v. United States, 119 U. S., 27, the action of Congress complained of there was but an exercise of the full administrative power possessed by Congress ' over Indian tribal property, “ the property of those who * * * were in substantial effect the wards of the Government. As Congress possessed full power in the matter the judiciary can not question or inquire into the motives which prompted the enactment of the legislation. If injury was occasioned, which we do not wish to be understood as implying, by the use made by Congress of its power, relief must be sought by an appeal to that body for redress and not to the courts.”
And in the case of Cherokee Nation v. Hitchcock, supra, the court quoted from a Senate document to the effect that “ the title to these lands is held by the tribe in trust' for the people.”
As the plenary authority over the occupants of these lands has always been deemed a political power not subject to be controlled by the judicial department of the Government,, the claim of this railroad, as I see it, is not within the power of the court to aid. Its right never vested sufficiently for the courts to say that Congress did not reserve the power of control enough to make the grant effective without the consent of the occupants or to carry out the promises of the treaties without the consent of the railroad because there were no covenants expressed or implied to either extinguish the Indian title or to open the lands to the public except for Indian uses.
The action of Congress carrying out the treaties of the Government with the occupants of these lands was in no sense the repudiation of an implied promise to the railroad, because no promise could be im/plied against the right of the Government to deal with the manner, time, and conditions of extinguishing the titles outstanding at the time of the grant. These were matters exclusively for the consideration of the Government and can not be interfered with nor put in contest by private parties. Buttz v. Northern Pacific Railroad, 119 U. S., 55.
This court is without authority to entertain jurisdiction on the demand of plaintiff for a money judgment for the *121 want of covenants carrying an express promise, or, by necessary implication, an implied promise to pay. There is no more jurisdiction in this court to entertain such a proceeding than there is in the courts where the lands are situate to. maintain ejectment proceedings against the occupants for the possession of the lands.

 Sec. 8. And he it further enacted, That said Kansas & Neosho Valley Railroad Co., its successors and assigns, is hereby authorized and empowered to extend and construct its railroad from the southern boundary of Kansas south, through the Indian Territory, to. Red Riyer, at or near Preston, in the State of Texas, so as to connect with the railway now being constructed from Galveston to a point at or near Preston, in said State, and the right of way through the Indian Territory, wherever such right is now reserved or may hereafter be reserved to the united States by treaty with the Indian tribes, is hereby granted to said company, to the same extent as granted by the sixth section of this act, through the public lands; and in all cases where the right of way, as aforesaid, through the Indian lands shall not be reserved to the Government, the said company shall, before constructing its road, procure the consent of the tribe or tribes interested, which consent, with all its terms and conditions, shall be previously approved and endorsed by the President and filed with the Secretary of the Interior.
Sac. 9. And he it further enacted, That the same grants of lands through the Indian Territory are hereby made as provided in the first section of this act, whenever the Indian title shall be extinguished by treaty or otherwise, not to exceed the ratio per mile granted in the first section of this act: Provided, That said lands become a part of the public lands of the united States.
Sec. 10. And he it further enacted, That said Kansas & Neosho Valley Railroad Co., its successors and assigns, shall have the right to negotiate with and acquire from any Indian nation or tribe, authorized by the United States to dispose of lands for railroad purposes, and from any other nation or tribe of Indians through whose lands said railroad may pass, subject to the approval of the President of the United States, or from any company or parties incorporated or authorized. for such purposes, by such nation or tribe, or which such parties may have acquired under the laws of the United States.
Sec. 11. And he it further enacted, That any railroad company chartered under any law of the United States, or of the State of Kansas, which may have been heretofore or shall hereafter be recognized and subsidized by any act of Congress of the United States, may connect, unite, and consolidate with this railroad company, after the same shall be located to the valley of the Neosho River, upon just, fair, and equitable terms, to be agreed upon *88 between the parties, and shall not be against the public interest or the interest of the United States ; nor shall any road authorized to connect as aforesaid charge the road so connecting a greater tariff per mile for freight or passengers than is charged for the same per mile by its own road: And provided further, That should the Leavenworth, Lawrence & Fort Gibson Railroad Co., or the Union Pacific Railroad Co., Southern Branch, construct and complete its road to that point on the southern boundary of the State of Kansas where the iine of said Kansas & Neosho Valley Railroad shall cross the same, before the said Kansas & Neosho Valley Railroad Co. shall have constructed and completed its said road to said point, then and in that event the company so first reaching in completion the said point on the southern boundary of the State of Kansas shall be authorized, upon obtaining the written approval of the President of the United States, to construct and operate its line of railroad from said point to a point at or near Preston, in the State of Texas, with grants of land according to the provisions of this act, but upon the further special condition, nevertheless, that said railroad company shall have commenced in good faith the construction thereof before the said Kansas & Neosho Valley Railroad Co. shall have completed its said railroad to said point: And provided-father, That said other railroad company, so having commenced said work in good faith, shall continue to prosecute the same with sufficient energy to insure the completion of the same within a reasonable time, subject to the approval of the President of the .United States: And provided fw'ther, That the right of way through private property, when not otherwise provided for in tMs act, or by the law of any State through which the road may pass, shall be obtained by said Kansas & Neosho Valley Railroad Co., or either of the other companies named in this act, in accordance with the provisions of section three of an act to amend an act entitled “An act to aid in the construction of a railroad and telegraph line from the Missouri River to the Pacific Ocean, and to secure to the Government the use of the same for postal, military, and other purposes,” approved July first, eighteen hundred and sixty-two.