Hunt, J.,
delivered the opinion of the court:*
The dimensions of this case have greatly diminished since its first appearance on the files of this court. The original petition filed by the claimants on the 10th April, 1868, prayed judgment against the government for $500,000. On the 3d November, 1869, the claimants reiterated their demand for that amount, varying somewhat the technical grounds upon which the demand rested. Afterwards, on the 31st of January, 1879, they amended their petition and reduced their claim to the sum of $143,592. They now come before the court and are content to ask a judgment for $15,692.
The several amendments under which the demand of the claimants has thus dwindled have been permitted by the court in the exercise of its undoubted discretion. The allowance of the last petition, filed January 31, 1879, is strenuously resisted by the counsel for the government. He insists that this amended petition should be dismissed, because its allegations are inconsistent with those previously made, and because it sets forth a novel cause of action which was barred by the statute of limitations at the date when the petition was filed. According to *189 the liberal rule of modern jurisprudence in this country and in England, courts are inclined to permit amendments to pleadings for the very purpose of preventing the barst operation of tl)e statute. Under circumstances which attest the good faith'of parties, there is a manifest equity in relieving them from the loss of valuable rights, which they may have failed properly to assert, through error, inadvertence, or ignorance, or a disregard of technicalities on their own part or on that of their attorneys. In this instance the inconsistency in the pleadings which is insisted on by the counsel for the government is not satisfactorily shown. The cause of action throughout the several petitions and amended petitions remains substantially the same. Had the claimants recovered judgment on their original petition, such judgment would have constituted a complete and valid bar to any further recovery on the amended petitions. In the recent case of Thomas v. The United States, the subject of the allowance of amendments in this court was fully considered. Under the doctrines there announced, the amended petition now under examination was properly allowed. (15 C. Cls. R., 342; Rev. Stat., § 954; Tiernan's Ex. v. Woodruff, 5 McLean; Crimm v. Crawford, 29 Ala., 623; 2 Tidd’s Prac., 698; Crane v. Malins, 6 Eng. L. & E., 568; Crawford v. Code, 3 Eng. L. & E., 594.)
Narrowed down to its present compass, and divested of extraneous prolixity, the case of the claimants is substantially this: The Great Falls Manufacturing Company is a corporation created by the laws of Yirginia. The company claim the sum of $15,692 as compensation for a portion of an island in the Potomac Biver, near Washington, known as Conn’s Island, of which the United States took possession in the year 1864, and which they have ever since used; and also for the property rights of the claimants in the water drawn from the Potomac Biver in that locality by the aqueduct for the use of the capital.
The claimants base their right to recover upon two grounds: First, they claim under an agreement and award of certain commissioners hereafter explained, which they assert is of the nature and binding effect of an express written contract; and, secondly, they contend that if the,written contract be held invalid, the government is still liable under an implied contract to make a just compensation to them for their property, taken for public uses.
*190 A brief bistory of tbe events and circumstances connected with this claim becomes necessary to its proper consideration.
On tbe 31st of August, 1852, Congress appropriated $5,000 to enable tbe President to cause tbe necessary surveys to be made in order to determine tbe best methods of securing a supply of pure and wholesome water for tbe cities of Washington and Georgetown. In execution of this purpose, General Totten, of tbe Corps of Engineers, U. S. A., transmitted an elaborate report to President Fillmore, by whom it was laid before Congress. On tbe 3d of March, 1853, Congress appropriated $100,000 for tbe purpose of bringing water into tbe city of Washington, upon such plans and from such places as tbe President might approve; provided, that if tbe plan adopted by tbe President should require water to be drawn from any source within tbe limits of the State of Maryland, tbe assent of tbe legislature of that State should be first obtained. Under tbe authority of this act, tbe President approved tbe plans for an aqueduct supplied with water from the Potomac Eiver at a point just above tbe Great Falls. This aqueduct lias since been constructed.
On tbe 3d of May, 1853, tbe legislature of Maryland passed an act giving tbe assent of tbe State to such plan as might be adopted by tbe President for supplying tbe city of Washington with water. This statute provided that tbe United States might purchase such lands and materials, and construct such dams, buildings, and other works in tbe State of Maryland, as might be necessary for that purpose. Tbe statute made provision in case tbe United States could not agree with tbe owners for tbe purchase of tbe required land and materials, that tbe United States might enter upon such lands, and take and use such materials “after having first made payment, or tendered payment at tbe valuation assessed thereon,” in a prescribed manner.
Tbe officers of tbe government adopted as tbe proper location for tbe termination of tbe aqueduct a site on the property of the claimants, which is minutely designated and described in the findings of fact in this case, and which it is unnecessary, for this decision, to further particularize.
After tbe location of the works, the government took steps to acquire title to the property desired, and to ascertain the damages to tbe claimants.
*191 Overtures for tbe amicable purchase of the required property were made, but no satisfactory result was reached.. Failing to come to terms with the claimants, the government resorted to legal proceedings in order to accomplish its object. Accordingly, on the 27th of July, 1858, proceedings were instituted in the court of Montgomery County, Maryland, under the statute of that State. In these proceedings the damages to the claimants were assessed at $150,000. This assessment was set aside by a judgment of the circuit court of Montgomery County for a number of reasons, and proceedings ele novo were ordered to be had. Nothing further was, however, then done in the matter. For several years the appropriations made by Congress for this work were expended upon other portions of it, up to the time when the aqueduct was approaching completion. It then became necessary to take further steps towards securing the site which had been selected upon the property of the claimants.
Previous to this, on the 3d of March, 1859, Congress had placed this work under the direction and control of the Secretary of the Interior. (11 Stat. L., 435.) That officer, impressed with the embarrassments attendant upon a renewal of proceedings before the Maryland courts, and with the intrinsic difficulties of the subject itself, determined to adopt some other mode under which the amount of compensation to which the claimants would become entitled might be ascertained. They were entitled to compensation for the value of the real estate, and also of the property rights in the water to be taken for the public use. Efforts were therefore renewed to compass the peaceable adjustment of the claimants’ rights.
On the 20th of November, 1862, the Secretary of the Interior, charged with the direction and control of the work in the manner already stated, entered into an agreement in writing with the claimants, the substantial provisions of which are succinctly stated, as follows:
It commenced with a recital of the objects sought to be obtained, and the expenses, difficulties, and embarrassments attending the previous efforts of the parties to determine their respective rights amicably; and the impracticability of any successful result in proceedings under the State laws; and, u with a view to a fair, prompt, and final settlement of the controversy,” it was agreed that the whole matter should be sub *192 mitted to the arbitrament of Jesse L. Williams, of Indiana; B. R. Curtis, of Massachusetts; G. Swan, of Ohio; Linus Child, esq., of Massachusetts; and George M. Dallas, of Pennsylvania.
That the claimant should file a description of the lands to be affected, and that the arbitrators should act as though the title were valid, but that the award should not be binding unless the Attorney-General should decide the title was valid.
The arbitrators were to decide upon and award the compensation to which the claimant should be entitled.
If dissatisfied, either party could, within thirty days after the award, proceed, by bill in equity in the circuit court of the District of Columbia, to set aside or change the award and obtain such a decree as would be just and equitable; otherwise, the award was to be final and conclusive.
Either party dissatisfied with this decree could, in like manner, appeal to the Supreme Court of the United States.
The Hon. Alonso O. Paige was substituted for Mr. Dallas as a member of the commission, before proceeding with the case.
The counsel were Caleb Cushing for the claimants and Joseph H. Bradley for the government.
This commission was a remarkable body. Its members were distinguished jurists, of great erudition, experience, and elevated personal character. Some of them were especially conspicuous for their known familiarity with and experience in the law regulating riparian rights and in hydraulics. At its head was that enlightened, upright, and able judge, Benjamin R. Curtis, whose name is illustrous in American jurisprudence. The counsel of both parties were scarcely less eminent.
At the time of the organization of the commission, the works, had not been constructed. Four different plans for these works had been prepared by the officers of the Corps of Engineers appointed by the President to act under the Secretary of the Interior. (11 Stat. L., 435.) These plans were submitted to the judgment of the commission.
The commissioners at once entered upon the business intrusted to them, examined numerous witnesses and much documentary evidence, and heard argument of counsel.
On the 28th of February, 1863, they filed their report estimating the damages which would result from the construction of the works according to each of the four plans submitted to them. The compensation to be paid to the claimants was fixed by them *193 as follows: For the first plan, $50,000; for the second, $03,766; for the third, $77,200, and for the fourth, $15,692. The commissioners also decided that the titles of the claimants were valid and satisfactory.
More than a year elapsed after this decision without action on the part of the government. No bill in equity was filed to set aside or disturb the findings of the commission. No appeal was taken from their decision; no dissatisfaction was intimated with regard to it. The Attorney-General expressed no opinion adverse to the validity of the claimants’ title. On-the contrary, on the 4th day of July, 1864, Congress appropriated $150,000 for the purpose of constructing the dam of solid masonry across the Maryland branch of the Potomac Eiver, near the Great Falls, and for other purposes. (13 Stat. L., 384.) The fourth plan was then substantially adopted; and on the 30th of July, 1864, the government entered into a contract for the construction of the dam, and proceeded at once to occupy as much of the claimants’ laud as was required under this plan, and has ever since drawn such quantities of water from the Maryland channel as were needed for the aqueduct. In accordance with the principal features of this plan the work was finished in 1867.
From this brief history, the right of the claimants to recover on the award of the commissioners ax>pears clear. Although their report is called an “ arbitration and award,” yet it was not such in reality, as will more fully appear. The supervision of the undertaking had been fully confided to the Department of the Interior, and all appropriations for the completion of the water-works were to be expended under the direction of the Secretary of that department. It had been previously provided that the assent of the State of Maryland should be obtained in case the required water was drawn from any source within the limits of that State. That State gave its express consent that the United States might purchase such land and construct such dams, reservoirs, buildings, and other works as might become necessary to the purpose. The statute went on to provide that if the United States could not agree with the owners for the purchase of' any land, they might institute proceedings at law for the condemnation and assessment of lands or materials similar to those provided in the case of the Chesapeake and Ohio Canal.
*194 Here, then, was the assent of the State, first to the purchase of such lands, &c.; and, second, in case of failure to agree with the owners for the purchase of such lands, &e., here were provisions for a mode of procedure under the statute for their condemnation and assessment.
It appears that the claimants and the Secretary, the agent of the government, had been in the beginning unable to agree upon the terms of the purchase of the claimants’ property. They therefore had taken steps for its forced alienation. The result of these steps was an assessment of damages in favor of the claimants of $150,000. To this assessment the government objected and caused it to be vacated. They then abandoned the legal proceedings and determined to acquire the property of the claimants in the mode first pointed out by the statute of Maryland — that is to say, by agreeing to purchase it. They were, however, undetermined as to the precise location and construction of the works, and were also uncertain as to the price which should be paid to the claimants. It was under these circumstances that the Secretary agreed with the claimants that ■ the four plans which had been suggested and developed by the engineers of the government should be laid before a commission of capable and disinterested persons. This commission was to assess the price to be paid to the claimants under each of these plans. The Secretary, if he judged that the price was reasonable at which the rights and property of the claimants were appraised, might purchase them according to any one of the four plans.
The commission were to act in the character of appraisers. The Secretary had the right to call in their aid to guide him in determining what price it would be fair for the government to pay. He was not bound irretrievably by the prices set by the commission. Ample provision had been made in the agreement for a review in the courts of the whole subject-matter, if either party to the instrument were dissatisfied with the ap-praisements.
That the Secretary was wise in seeking counsel from such competent and distinguished advisers no one will doubt. Their opinion is entitled to the most profoun d respect. It carries with it at least the moral power of a final judicial decision; and this court would be slow to dissent from its high authority. It has fixed the value of the claimants’ property, as that property was *195 finally taken by the government, at $15,692. There appears to be no reason for believing this price excessive or unfair. The claimants are entitled to recover this amount under their express written agreement with the government,
It is said that the Secretary of the Interior has no right to enter into this agreement. The several acts of Congress already referred to required the obtaining a supply of water for the cities of Washington and G-eorgetown, in accordance with a plan approved, by the President. This plan required for its execution the occupancy and enjoyment of the land and water privileges belonging to the claimants. The Secretary of the Interior was charged with the duty of carrying it into effect. In doing so the property of the claimants would be acquired in one of two ways, either by consent of the parties to a purchase, or by forced alienation under legal process. The final decision of the Secretary seems to have been to acquire the claimants’ property by amicable purchase. He had a right to call in experts to advise him as to its true value. Such a right springs from the power to purchase. Gum quid eonceditur, eonceditur et id per quod pervenibur ad illud. In making the agreement for the appraisement he was only carrying out and in no manner exceeding the trust imposed upon him by Congress.
But giving to the agreement and the report the character said to belong to them of a submission and award, it by no means follows that the Secretary had not in this instance the power thus to arbitrate. If he possessed the power in relation to the subject-matter of the submission to carry into effect the decree which the award might direct, he had the power to consent to the submission. (Morse on Arb., p. 4.)
He certainly was clothed with authority to effect the purchase of the claimants’ land and water privileges. He could elect either of the two methods provided by the Maryland statute— by a contract of sale by consent of parties, or by forced alienation by judicial proceedings. Having consented with the claimants to acquire by sale, the means through which the fair price should be ascertained and the purchase thus become complete might properly be submitted to the decision of discriminating and disinterested persons, subject to the ratification of the parties in interest. There is no prohibition, express or implied, against the employment, by the Secretary, of such means in order to effect a purpose intrusted to him by Congress.
*196 But, in tbe present instance, if there were any infirmity of authority in the original power of the Secretary of the Interior to consent to the agreement and award, such infirmity has been cured by the subsequent acts of the government. At the very nest session of Congress after the report of the commissioners, an act was passed “ appropriating $150,000 for the purpose of constructing the dam of sold masonry across the Maryland branch of the Potomac Elver near Great Falls,” &c. (Act July 4,1804.) The costs of the investigation and the compensation of the commissioners were paid by the government. The property of the claimants was taken into possession and enjoyed by the government. The fourth plan of operations submitted to the commissioners ’was substantially adopted in the construction of the works. Appropriation has followed appropriation for the maintenance and completion of the work from year to year, exceeding three millions and a half up to March, 1867. All of. these acts on the part of the government, commencing when the report of the commissioners was yet fresh in the public mind, when the occupation and enjoyment of the claimants’ property by the government has been manifest to the public and under the very eyes of Congress, constitute a contemporaneous and continuous interpretation of the rights of the claimants, which is inconsistent with any other hypothesis than the ratification of the acts of the Secretary of the Interior in this matter. Such a ratification dates back to the first exercise of authority by an agent, and imparts to his acts full validity. Ortmis ratihdbitio retrotrahitur et mandato priori equipa-ratur.
But the government objects that the Attorney-General has not decided that the claimants had a valid title to the land occupied, and that by the second article of the agreement such decision by that officer is a condition precedent which has not been complied with. To this objection the claimants offer a satisfactory answer. They say that this was not a condition which they were required to perform. That the article required them only to furnish evidence of their title, and that they had done this. The facts found by the court show that the referees examined and passed upon the title of the claimants and decided that it was valid and satisfactory, and, further, that no adversary title to theirs is or has ever been asserted. Since the Attorney-General did not demur to the opinion of these *197 eminent jurists, it may well be inferred that he concurred in that opinion. It was within the power of the government but never in the power of the claimants at any time to require the Attorney-General to decide upon the validity of the title on which the referees had passed. It was for their-benefit alone that the condition was agreed to. It is a well-settled principle of law that if a party to a contract, who is entitled to the benefit of a condition, upon, the performance of which his responsibility is to arise, dispense with or by any act of his own prevent or omit the performance, the'opposite party is excused from proving a strict compliance with the condition. (Williams v. Bank of United States, 11 Pet., 102.) Thus, if the precedent act is to be performed by a party, and such performance of it is prevented by the absence or failure of the party who has a right to claim it, the law will not permit him to set up the non-performance of the condition as a bar to the responsibility which his part of the contract had imposed upon him.
As a further answer to this objection of the government, the claimants say that there has been a waiver by the government of the condition referred to by taking possession of and holding the claimants’ property. This position is undoubtedly sound. If the title of the claimants has been good enough to justify the government in taking and enjoying the property, it is certainly good enough to justify them in paying for it when that title has never yet been challenged.
The second ground on which the claimants seek to recover is under an implied contract of the government to make just compensation for the property. It follows that if the property has not been taken under the agreement, it must have been taken under the right of eminent domain. - This right exists in the United States, and it has been held that it can neither be enlarged nor diminished by a State. Nor can any State prescribe the manner in which it must be exercised. The consent of a State can never be a condition precedent to its enjoyment. (Kohl v. United States, 91 U. S. R., 367.)
In the case of Langford v. The United States (101 U. S. R., 343), the Supreme Court said: “We are not prepared to deny that when the Government of the United States, by such formal proceedings as are necessary to bind it, takes for public use, as for an arsenal, custom-house, or fort, land to which it asserts no claim of title, but admits the ownership to be private *198 or individual, there arises an implied obligation to pay the owner its just value.”
The rights of the claimants in the present instance clearly arise ex contraetu and not ex delicto. If there be a failure in the completeness and validity of the convention between the government and the claimants, such failure has arisen from the technical incorrectness of forms, which would have been sufficient to bind it had they been entirely accurate. Such defect may deprive the obligation of the character of an express contract, but does not prevent it from falling within the category of implied contracts. It is certainly inconsistent with any pretense that the obligation is ex delicto. ■
It only remains to determine the amount of the compensation which the claimants are entitled to recover.
The measure of this compensation is defined in the language of the Constitution: Private property shall not be taken for public use “without just compensation.” What compensation is deemed to be just is, at least in some cases, not a novel question. We have been enlightened on the subject by precedents that carry with them the weight of sound reason and commanding authority. The subject has lately undergone careful consideration by the Supreme Court of the United States in the case of the Boom Co. v. Patterson (98 U. S. R., 403), a case which, in most of its features, bears a striking resemblance to that now before ns. The court there say: “The inquiry in such cases must be, What is the property worth in the market,, viewed not merely with reference to the uses to which it is at the time applied, but with reference to the uses to which it is plainly adapted, that is to say, what is it worth from its availability for valuable uses ? Property is not to be deemed worthless because the owner allows it to go to waste, or to be regarded as valueless because he is unable to put it to any use.” Guided by the light of this authority, it is not difficult to reach a result in the present instance. The adaptability of the claimants’ land and of their water privileges to the purposes to which they have both been applied by the government constitutes a proper element to be taken into account in estimating their value. It is no answer to this view to say that the claimants could not have themselves made as advantageous use of this property. That objection is at once met by retorting that the government could not have made as advan *199 tageous use of any other property of a like nature which was indispensable to the objects to be attained. The substitution of such other property would have involved the expenditure, at the very lowest estimate, of double the amount of the cost of the works as they have been located. It is not pretended that the damages of the claimant are to be measured solely by the savings of the government 5 but such savings are not to be lost sight of in determining the value of the property enjoyed.
Although these principles may not lead to the ascertainment with mathematical precision of an exact amount, they nevertheless constitute the rules laid down for our guidance. They are based upon those simple principles of natural justice which commend themselves to minds of ordinary intelligence. Any other rules are beset with intricacies, mathematical calculations, and complications that are too refined and abstruse for the common affairs of life. Thus the ingenious formula presented by the government seems to us especially open to objection. The defendants’ argument is as follows:
“ How is that market value to be ascertained?
11 Plainly by an examination into the value of the right and power to supply the city of Washington with water; by ascertaining the cost of building the necessary dam, constructing the conduit and reservoirs, laying the mains, keeping the whole affair in order, paying the salaries of clerks, officers, laborers, and watchmen; and the difference between the income to a company supplying Washington with water, on the one hand, and interest on the outlay plus running expenses on the other, would represent the actual annual sum which any person could afford to pay for the use and occupation of the soil of the Great Falls Company, and of the soil of every land-owner (including the United States) between Washington and Great Falls, over which the water is carried. When that difference is ascertained and apportioned among the several owners in proportion to the value and extent of their contribution, we would know how much the plaintiff should receive per annum, and that sum would represent the interest on the actual value of so much of Conn’s Island as we have taken, and would be the very best evidence of its market value, in reference to its adaptability for an abutment to a dam that would supply Washington with wnter.”
This solution of the problem is beset with difficulties and entirely impracticable. The simpler and primitive result at which the commissioners arrived is more readily comprehended, and more satisfactory.
*200 The judgment of the court is that the claimants recover, as compensation for all past and future use of land and water rights, as set forth in the finding, and conclusion of the court, the sum of $15,592.

 The opinion in this case, read on the 28th February, 1881, was the last opinion delivered hy Mr. Justice Hunt prior to his becoming Secretary of the Navy. '