**TENASKA WASHINGTON PARTNERS II, L.P., Plaintiff,**

**v.**

**The UNITED STATES, Defendant.**

No. 95–420C.

United States Court of Federal Claims.

Nov. 9, 1995.

Stephen S. Walters, Portland, OR (Charles F. Adams and Scott J. Kaplan, Stoel Rives Boley Jones & Grey, of counsel), for plaintiff.

Richard P. Nockett and John W. Showalter, Sean W. Colligan, Washington, DC, with whom was Assistant Attorney General Frank W. Hunger, for defendant.

## OPINION

MILLER, Judge.

This case is before the court after argument on defendant's motion to dismiss or stay and to compel arbitration and plaintiff's cross-motion to enforce the parties' arbitration agreement if they are required to arbitrate their dispute. A partnership seeks to hold the Bonneville Power Administration, an agency within the Department of Energy, liable for breach of a written contract to develop electrical power, including construction of a power plant. The Government terminated the contract after construction began, but before the power plant was built. At issue is whether, under the terms of the contract, defendant can compel plaintiff to participate in arbitration proceedings. Plaintiff insists that, if arbitration is ordered, the Government must be bound to any decision and that the arbitration provision must be enforced insofar as it requires the Government to continue to perform its contractual obligation to make payments on the contract pending arbitration.

## FACTS

The following characterization of the case is gleaned from the pleadings. For the purpose of ruling on the parties' cross-motions, the court need not make any findings of fact.

On July 16, 1992, the Bonneville Power Administration ("BPA"), an agency within the Department of Energy ("DOE"), and Tenaska Washington Partners II, L.P. ("plaintiff"), a Washington State partnership, entered into a Letter of Intent specifying terms upon which BPA proposed to acquire all of the electrical output of the Frederickson Generation Project. The proposed plant was a combined-cycle combustion turbine unit with a net gathering capacity of 248 megawatts to be constructed by plaintiff in the Frederickson Industrial Area in the State of Washington. BPA selected plaintiff's project as a result of a competitive bidding process. The Letter of Intent provided, among other things, that plaintiff would terminate efforts to sell electric power and energy from the project to other potential customers and that BPA would sign a Power Purchase Agreement with plaintiff only after BPA completed required regulatory processes.

On April 1, 1994, plaintiff and BPA entered into a Power Purchase Agreement. Under the terms of the agreement, BPA agreed to purchase and take from plaintiff, and plaintiff agreed to sell and deliver to BPA, for a period of 20 years, the entire net electrical output of the Frederickson Generation Project. In furtherance of the agreement, plaintiff entered into contracts with a consortium of banks to provide financing for the project and with other entities to construct, operate, maintain, and provide fuel supplies and transportation for the project. Construction of the project began in 1994.

On April 17, 1995, at a meeting in Chicago, Illinois, Judith Johansen, BPA's Vice President, Generation Supply, orally informed plaintiff that BPA would not perform its obligations under the agreement. In an April 20, 1995 letter, Ms. Johansen confirmed that BPA determined that it was excused from further performing its obligations under the terms of the agreement because of alleged supervening events. The letter stated: "As a consequence of events supervening the agreement, BPA's primary purposes in acquiring the power resource ... have been frustrated and the resource has ceased to have value to BPA." The letter also stated that "BPA has determined that it is excused from any further obligations under the Agreement, after April 17, 1995," and returned the letter of credit securing plaintiff's performance obligations under the agreement.

Following exhaustion of procedures for claims under the Contract Disputes Act of 1978, 41 U.S.C. §§ 601–613 (1988 & Supp. V 1993), on June 23, 1995, plaintiff instituted suit in the United States Court of Federal Claims alleging that BPA breached the

agreement. On June 27, 1995, four days after filing in this court, plaintiff filed in the United States Court of Appeals for the Ninth Circuit a "Petition for Review Under the Northwest Power Act (Precautionary)" (the "Ninth Circuit Petition"), alleging that BPA breached the parties' agreement. Shortly thereafter, on July 6, 1995, plaintiff filed in the Ninth Circuit a motion to transfer the matter to the Court of Federal Claims pursuant to 28 U.S.C. § 1631 (1988 & Supp. V 1993). On the same date, plaintiff filed in this court a "Notice of Filing of Precautionary Petition for Review," asserting that its pending Ninth Circuit Petition did not divest the court of jurisdiction pursuant to 28 U.S.C. § 1500 (1988 & Supp. V 1993), because the Petition was "expressly precautionary" and the Ninth Circuit lacked subject matter jurisdiction. On August 22, 1995, at plaintiff's request, its Ninth Circuit petition was transferred to the Court of Federal Claims.[1]

The agreement included an arbitration clause which reads in full:

DISPUTE RESOLUTION

Pending resolution of a disputed matter, the Parties shall continue performance of their respective obligations pursuant to this Agreement. Disputes regarding any matter relating to this Agreement shall be discussed by the Authorized Representatives who shall use their best efforts to amicably and promptly resolve the dispute. Should the Authorized Representatives be unable to resolve any controversy or claim arising out of or relating to this Agreement, or the breach thereof, the Parties agree that the controversy or claim shall be settled by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association, and judgment upon the award rendered by the Arbitrator(s) may be entered in any court having jurisdiction thereof.

Because of changes in legal posture, the sequence of arguments contained in the par-

ties' briefs deserves special attention. On July 31, 1995, anticipating filing a motion to compel arbitration, as purportedly required under the contract, defendant filed a Motion for a Protective Order Staying Discovery. Plaintiff opposed the motion, arguing that BPA lacked constitutional or statutory authority to enter binding arbitration. On August 22, 1995, defendant filed its Motion To Dismiss or Stay and To Compel Arbitration, and plaintiff opposed and cross-moved. Plaintiff emphasized the lack of constitutional and statutory authority and the inapplicability of the arbitration clause to this type of dispute. Defendant replied with a brief of extraordinary import. Defendant argued that long-standing opinions of the Department of Justice regarding the constitutionality of binding arbitration had been reviewed and reversed through a memorandum dated September 7, 1995 from the Office of Legal Council (the "OLC").

Defendant requests a dismissal or stay of the proceedings and an order compelling plaintiff to submit its claim to arbitration based on the terms of the agreement. Defendant takes the position that the arbitration clause is binding on the parties and thus that arbitration is mandatory. Plaintiff and defendant have cross-moved on the basis of the plain language of the contract. In addition, plaintiff cross-moves for an order that, if it is required to submit to arbitration, 1) the award entered by the arbitrators will be binding on both parties, and 2) BPA must continue performance of the agreement pending resolution of the dispute.

## DISCUSSION

■ Enacted in 1925, the Federal Arbitration Act, 9 U.S.C. §§ 1–16 (1988 & West Supp.1995) (the "FAA"), "revers[ed] centuries of judicial hostility to arbitration agreements, [and] was designed to allow parties to avoid 'the costliness and delays of litigation,' and to place arbitration agreements 'upon

---

1. In its moving brief, defendant indicated that plaintiff's then-pending Ninth Circuit petition for review of BPA's action divested this court of jurisdiction under 28 U.S.C. § 1500. For multiple reasons, including transfer of the case to the Court of Federal Claims, the timing of the filings,

and the continued validity of *Tecon Eng'rs, Inc. v. United States*, 170 Ct.Cl. 389, 343 F.2d 943 (1965), *cert. denied*, 382 U.S. 976, 86 S.Ct. 545, 15 L.Ed.2d 468 (1966), the section 1500 issue is moot. Defendant recognized such in its brief filed on October 11, 1995.

the same footing as other contracts.'" *Scherk v. Alberto–Culver Co.*, 417 U.S. 506, 510–11, 94 S.Ct. 2449, 2452–53, 41 L.Ed.2d 270 (1974) (citation omitted) (quoting H.R.Rep. No. 96, 68th Cong., 1st Sess., 1, 2 (1924)). The FAA embodies a congressional declaration of a liberal federal policy favoring arbitration agreements, and the Supreme Court has agreed that questions of arbitrability must be addressed with a healthy regard for that preference. *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983).

Section 2 of the FAA declares that "[a] written provision ... [to arbitrate] a contract evidencing a transaction involving commerce ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The term "commerce" is defined in section 1 of the FAA to include "commerce among the several States." 9 U.S.C. § 1. Section 3 of the FAA allows a stay of court proceedings upon a finding that "the issue involved in such suit or proceeding is referable to arbitration under such an agreement." 9 U.S.C. § 3.

■ Defendant asks the court to stay or dismiss plaintiff's action and compel arbitration. Defendant must establish affirmatively a legal and contractual platform upon which arbitration may be compelled. Defendant therefore must demonstrate that no constitutional or statutory impediment is present that would make the FAA inapplicable to the arbitration clause in the parties' agreement; that the agreement requires the parties to arbitrate their disputes; and that the dispute in question is covered by the arbitration clause. *See, e.g., Half–A–Car II, Inc. v. Interstate Hotels Corp.*, No. CIV. A. 93–5834, 1994 WL 587696 (E.D.Pa. Oct. 25, 1994); *Pennsylvania Data Entry v. Nixdorf Comp. Corp.*, 762 F.Supp. 96, 98 (E.D.Pa.1990).

### 1. *Constitutional concerns*

Due to the extraordinary nature of the constitutional issues involved, this subject forms the initial step of inquiry. A brief summary of the history and substance of the old and recently announced positions is illuminating.

For over 150 years of legal practice, extending to modern venues, the United States, acting through the Department of Justice, positioned that the Constitution bars the United States from submitting to binding arbitration by an independent arbitrator. For example, within the last five years, the Senate Committee on Governmental Affairs observed, during hearings on the Alternative Dispute Resolution Act, 5 U.S.C. §§ 571–596 (West Supp.1995) (the "ADRA"),[2] that "[t]he Justice Department argued that the use of binding arbitration by agencies which do not already have specific statutory authorization to do so raises serious constitutional concerns." Sen.Rep. No. 101–543, *reprinted in* 1990 U.S.C.C.A.N. 3931, 3935. In modern litigation the Department of Justice has taken a similar tack. *See, e.g.,* Def's Br. filed Aug. 15, 1994, at 28 n. 12 in *Water Isle Hotel & Beach Club, Ltd. v. United States*, No. 93–26C (Fed.Cl.) ("[Plaintiff's] demand for an order forcing the Government to participate in binding arbitration is ... inconsistent with the Appointments Clause of the United States Constitution"). While the OLC never previously issued an opinion on this matter, Assistant Attorney General for the OLC William P. Barr testified in 1989 that the Appointments Clause would prohibit the Government from entering into binding arbitration unless the arbitrators were appointed by one of the methods described in that Clause. *Use of Alternative Dispute Resolution by Federal Agencies: Hearings Before the Subcomm. on Oversight of Governmental Management of the Senate Comm. on Governmental Affairs*, 101st Cong., 1st Sess. 13 (1989) (testimony of William P. Barr). Even internal instructions within the Department of Justice concerning the course of litigation

---

**2.** The ADRA would not have applied to BPA in this case as the statute was primarily concerned with administrative agencies. 5 U.S.C. §§ 571–72. The ADRA expired through a "Sunset Provision" on October 1, 1995. Alternative Dispute Resolution Act, Pub.L. No. 101–552 § 11, 104 Stat. 2736 (1990). The ADRA is only mentioned because it implemented arbitration as an option for certain federal agencies.

prohibited the use of binding arbitration, noting that "[t]he Government cannot enter into agreements to participate in 'binding' arbitration." *See* Department of Justice, *Guidance on the Use of Alternative Dispute Resolution for Litigation in the Federal Courts,* 4 (Aug. 1992).

■ The legal basis cited for hostility to arbitration was primarily the Appointments Clause of the Constitution, U.S. Const. art II, § 1, cl. 2, and to a lesser extent the Take Care Clause, U.S. Const. art II, § 1, cl. 1; questions arising from Article III judicial power; the non-delegation doctrine; and the Due Process Clause of the Fifth Amendment.

The Appointments Clause provides:

[The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the heads of Departments.

U.S. Const. art. II, § 2, cl. 2. The clause sets forth the exclusive mechanism by which an officer of the United States may be appointed. *Buckley v. Valeo,* 424 U.S. 1, 124–37, 96 S.Ct. 612, 684–91, 46 L.Ed.2d 659 (1976) (per curiam). A rational, and apparently long-held, conclusion can be drawn that only an officer of the United States, a term which itself requires definition, can bind the United States to an action or payment. Arbitrators, traditionally retained for unique situations and virtually never appointed under the procedures mandated by the Constitution, were viewed specifically as non-officers, which presented a significant bar to participation in arbitration by the Federal Government.

On September 7, 1995, the OLC issued its memorandum entitled "Constitutional Limitations on Federal Government Participation in Binding Arbitration" (the "OLC Memorandum"). The OLC prepares formal opinions for the Attorney General, issues informal opinions and advice to various agencies of the Federal Government, and gives general advice to the attorney general. *See* 28 C.F.R. § 0.25(a) (1995). Memoranda issued by the OLC, including this one, are binding on the Department of Justice and other Executive Branch agencies and represent the official position of those arms of government. This particular Memorandum facially involved an extensive research, review, and refinement period, with input from several divisions and other offices, as well as high-ranking officials of the Department of Justice.

The scope of the OLC Memorandum's inquiry is "whether the Constitution in any way limits the authority of the Federal Government to submit to binding arbitration." OLC Memorandum at 1. The Memorandum ultimately reverses the view " 'that the Appointments Clause, U.S. Const. art. II, § 2, cl. 2, bars the United States from entering into binding arbitration.' " OLC Memorandum at 1 (citation omitted). The constitutional concerns which formed the basis of the prior views of the Department of Justice were supplanted:

We [the OLC] reaffirm our conclusion that the Appointments Clause does not prohibit the federal government from submitting to binding arbitration. In addition, we do not view any other constitutional provision or doctrine as imposing a general prohibition against the federal government entering into binding arbitration.

OLC Memorandum at 28. Specifically, on the topic of binding arbitration, the OLC Memorandum concludes:

Where there is no statute requiring parties to enter into binding arbitration, the parties may nevertheless agree to do so. The same may be said of the government when it is a party. Absent a statute to the contrary and assuming the availability of authority to effect any remedy that might result from the arbitration, we perceive no broad constitutional prohibition on the government entering into binding arbitration.... [I]t is sufficient, where the parties consent, if the agreement preserves Article III review of constitutional issues and permits an Article III tribunal to re-

view the arbitrators' determinations for fraud, misconduct, or misrepresentation. Such agreements [*i.e.*, arbitration agreements] should also describe the scope and nature of the remedy that may be imposed and care should be taken to insure that statutory authority exists to effect the potential remedy.

OLC Memorandum at 26 (citations omitted).

■ Because the OLC Memorandum is binding on the Department of Justice and other Executive Branch agencies, defendant is bound to assert the position. Of course, the fact that the Department of Justice asserts a legal theory does not bind the court to accept the reasoning as legally correct; in fact, the court should view any change in position with care. Nevertheless, the OLC Memorandum is a thorough and persuasive analysis, one which need not be replicated in this opinion because plaintiff does not muster substantial arguments in opposition.

■ Plaintiff takes issue with the OLC Memorandum's treatment of *Auffmordt v. Hedden*, 137 U.S. 310, 11 S.Ct. 103, 34 L.Ed. 674 (1890), arguing that the case involved "procurement of information" by a non-governmental officer rather than arbitration. *See* Plf's Br. filed Oct. 20, 1995, at 3–4. To the contrary, rather than mere information-gathering the "merchant appraiser," along with a government employee, was empowered to render final and binding decisions regarding valuation of goods. *Auffmordt*, 137 U.S. at 325–27, 11 S.Ct. at 107–08. *Compare* Plf's Br. filed Oct. 20, 1995, at 3–4 *with* OLC Memorandum at 10–11. Plaintiff also argues that the OLC Memorandum's discussion of the non-delegation doctrine is insufficient. Plf's Br. filed Oct. 20, 1995, at 5. While the basis of the short paragraph is derivative of earlier analysis, the proposition that the OLC Memorandum asserts is correct, *i.e.*, that the non-delegation doctrine does not per se prevent adjudication by civilian arbitrators. *See, e.g., Thomas v. Union Carbide Agric. Prod. Co.*, 473 U.S. 568, 590, 105 S.Ct. 3325, 3338, 87 L.Ed.2d 409 (1985). *Compare* Plf's Br. filed Oct. 20, 1995, at 5 *with* OLC Memorandum at 26–27. Similarly, although the Supreme Court suggested that more recent decisions would apply the Ap-

pointments Clause to a broader range of activities than formerly was the case, *see International Primate Protection League v. Administrators of Tulane Education Fund*, 500 U.S. 72, 80–81, 111 S.Ct. 1700, 1705–06, 114 L.Ed.2d 134 (1991), no immediate precedents extend the Clause's reach. The points with which plaintiff takes issue ultimately do not negate the patina of rationality that overlays the newly researched OLC Memorandum.

The Court of Federal Claims and its predecessors have had little opportunity to rule on questions of arbitration and the Federal Government, presumably because of the long-standing legal assumptions that prevented the Federal Government from entering into such agreements. In the only case directly on point, the United States Court of Claims allowed a contract dispute to be decided by an arbitrator, although the court did not discuss the constitutional issues involved. *George J. Grant Const. Co. v. United States*, 124 Ct.Cl. 202, 207, 109 F.Supp. 245, 247 (1953). A new era of federal arbitration may be dawning, the extent of which remains to be seen. As for this case, based on the substantial authorities presented in the OLC Memorandum, the court agrees that no constitutional impediment is present that inhibits BPA from submitting to binding arbitration.

### 2. *BPA's statutory authority*

■ While a constitutional impediment to binding arbitration would have required denial of defendant's motion, the lack of a constitutional prohibition does not authorize the stay that defendant seeks; rather, the court must be satisfied that statutory authority exists allowing the court to compel arbitration. The next inquiry is whether BPA is itself empowered to enter into binding arbitration. It goes without question that an agency of the Federal Government is only empowered to act within the statutory guidelines establishing its power and that any action exceeding its statutory authority is void. *Office of Personnel Mgmt. v. Richmond*, 496 U.S. 414, 424, 110 S.Ct. 2465, 2471, 110 L.Ed.2d 387 (1990).

*1) Standards for statutory interpretation*

 The starting point in any case calling for statutory construction must be the language of the statute itself. *See VE Holding Corp. v. Johnson Gas Appliance Co.,* 917 F.2d 1574, 1579 (Fed.Cir.1990), *cert. denied,* 499 U.S. 922, 111 S.Ct. 1315, 113 L.Ed.2d 248 (1991) (citing *Mallard v. United States Dist. Court for the S. Dist. of Iowa,* 490 U.S. 296, 300–01, 109 S.Ct. 1814, 1817–18, 104 L.Ed.2d 318 (1989)). "If the statute is clear and unambiguous 'that is the end of the matter, for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'" *Board of Governors of the Fed. Reserve Sys. v. Dimension Fin. Corp.,* 474 U.S. 361, 368, 106 S.Ct. 681, 685, 88 L.Ed.2d 691 (1986) (quoting *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984)); *see also Wyatt v. United States,* 2 F.3d 398, 400 (Fed.Cir.1993). "Unless exceptional circumstances dictate otherwise, '[w]hen we find the terms of a statute unambiguous, judicial inquiry is complete.'" *Burlington N. R.R. Co. v. Oklahoma Tax Comm'n,* 481 U.S. 454, 461, 107 S.Ct. 1855, 1859, 95 L.Ed.2d 404 (1987) (quoting *Rubin v. United States,* 449 U.S. 424, 430, 101 S.Ct. 698, 701, 66 L.Ed.2d 633 (1981)); *Wyatt,* 2 F.3d at 400.

 Absent a clearly expressed legislative intent to the contrary, the court ordinarily must regard the plain language of the statute as conclusive. *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980); *see also Principal Mut. Life Ins. Co. v. United States,* 50 F.3d 1021, 1024 (Fed.Cir. 1995). In determining the plain meaning of statutory language, the court must "assume 'legislative purpose is expressed by the ordinary meaning of the words used.'" *American Tobacco Co. v. Patterson,* 456 U.S. 63, 68, 102 S.Ct. 1534, 1537, 71 L.Ed.2d 748 (1982) (quoting *Richards v. United States,* 369 U.S. 1, 9, 82 S.Ct. 585, 591, 7 L.Ed.2d 492 (1962)); *see also Jones v. Brown,* 41 F.3d 634, 638 (Fed.Cir.1994). Although Congress is presumed to have known the basic rules of statutory construction when enacting legislation, *see McNary v. Haitian Refugee Ctr.,*

*Inc.,* 498 U.S. 479, 496–97, 111 S.Ct. 888, 898–99, 112 L.Ed.2d 1005 (1991); *see also Quaker State Oil Ref. Corp. v. United States,* 994 F.2d 824, 832 (Fed.Cir.1993), an attempt to infer congressional intent from extraneous sources is appropriate if intent is not clearly manifested by unambiguous statutory language. *See Quaker State,* 994 F.2d at 832.

*2) Powers of BPA Administrator*

The statute of primary importance in this case is 16 U.S.C. § 832a(f) (1988), which defines the general administrative authority of the BPA Administrator. The statute, as amended in 1945, defines the Administrator's ability to contract, as follows:

> Subject only to the provisions of this chapter, the Administrator is authorized to enter into such contracts, agreements, and arrangements, including the amendment, modification, adjustment, or [cancellation] thereof and the compromise or final settlement of any claim arising thereunder, and to make such expenditures, upon such terms and conditions and in such manner as he may deem necessary.

16 U.S.C. § 832a(f) (footnote omitted).

According to defendant, the authorizing language contained in the statute empowers the contracting officer to enter binding arbitration as a direct result of the officer's power to settle any claim arising from contracts or agreements, because the authority to settle a claim includes the authority to do so by arbitration. Relying on case law and the OLC Memorandum, defendant argues that "a government agency or officer may agree to resolve a claim through consensual binding arbitration without express statutory authority if the agency or officer has authority to settle or dispose of the claim." Def's Br. filed Oct. 11, 1995, at 13. Plaintiff counters that, regardless of the constitutional issues discussed above and in the OLC Memorandum, questions concerning binding arbitration and the concomitant liability of the United States cannot be submitted to private arbitrators without the express authorization of Congress. Plaintiff takes the position that BPA lacks such authority.

Section 832a(f) does not expressly authorize the contracting officer to enter into binding arbitration. Defendant, however, argues that case law and the operating guidelines for BPA allow for a reasonable, legally justifiable inference of just such a power. For support, defendant turns to *District of Columbia v. Bailey,* 171 U.S. 161, 171–72, 18 S.Ct. 868, 872, 43 L.Ed. 118 (1898). The Supreme Court held that, absent positive law to the contrary, the power to arbitrate would flow naturally from the ability of an officer to settle a claim. *Id.; see also Great Falls Mfg. Co. v. United States,* 16 Ct.Cl. 160, 195, 1800 WL 1206 (1881) (holding that Secretary of Interior had power to submit to arbitration "[i]f he possessed the power . . . to carry into effect the decree which the award might direct"), *aff'd on other grounds,* 112 U.S. 645, 5 S.Ct. 306, 28 L.Ed. 846 (1884); *cf.* 32 Comp. Gen. 333, 337 (1953) ("[O]fficer who does not himself have authority to settle unliquidated damage claims may not confer such authority by contract upon arbitrators.").

*Bailey* is no doubt distinguishable on the ground that the party at issue was the District of Columbia, rather than a government agency. Similarly, defendant's other examples of arbitration power flowing from settlement ability deal with government corporations. *See, e.g., Seaboard Coast Line R.R. Co. v. National Rail Passenger Corp.,* 554 F.2d 657 (5th Cir.1977) (enforcing binding arbitration agreement by Amtrak, a government corporation); *National R.R. Passenger Corp. v. Chesapeake & Ohio Ry. Co.,* 551 F.2d 136 (7th Cir.1977) (same). However, BPA is in a unique position among government agencies respecting its operating mandate.

The legislative history of section 832a(f) highlights the unusual mandate that Congress established for BPA, allowing the agency to operate in a manner similar to that of a private "business enterprise:"

The purpose of this bill is to permit the Bonneville Power Administrator to use better methods of administration in carrying out his present functions. . . . They would enable the Administrator to employ business principles and methods in the operation of a business enterprise and would eliminate some hampering procedures designed primarily for agencies conducting governmental regulatory programs.

H.R.Rep. No. 777, 79th Cong., 1st Sess. (1945), *reprinted in* 1945 U.S.C.C.A.N. 874. This view was reinforced through an opinion of the Comptroller General:

The legislative history of . . . [section 832a(f) ] indicates that its purpose was to free . . . [BPA] from the requirements and restrictions ordinarily applicable to the conduct of Government business and to enable the Administrator to conduct the business of the project with a freedom similar to that which has been conferred on public corporations carrying on similar or comparable activities.

Comp. Gen. No. B–105397 (Sept. 21, 1951). At the time of enactment in 1945, Congress did not consider arbitration powers for the Administrator, most likely because of the perceived constitutional impediments. However, Congress did imbue BPA with unique and flexible authority that has been exercised in various ways by the Administrator.

■ The BPA Administrator's authority has been broadly construed. *See, e.g., ALCOA v. Central Lincoln People's Util. Dist.,* 467 U.S. 380, 400, 104 S.Ct. 2472, 2485, 81 L.Ed.2d 301 (1984) (emphasizing Administrator's "broad discretion" to determine what should be in BPA contracts); *Utility Reform Project v. Bonneville Power Admin.,* 869 F.2d 437, 443 (9th Cir.1989) (noting Administrator's "expansive authority to settle contract claims"). Furthermore, as with most agencies, the BPA Administrator's interpretation of his authorizing statute is entitled to deference. *See Chevron,* 467 U.S. at 844–45, 104 S.Ct. at 2782–83.

3) *Power of BPA Administrator to commit to arbitration*

■ Committing to arbitration has long been recognized as a legitimate tool of conducting business and therefore reasonably can be concluded to be within those powers available to the BPA Administrator. The judicial hostility to arbitration is long dead, buried through the FAA. The current legal climate encourages the use of alternative dispute resolution through a "federal policy . . .

to ensure the enforceability, according to their terms, of private agreements to arbitrate." *Volt Info Sciences, Inc. v. Board of Trustees of Leland Stanford Univ.*, 489 U.S. 468, 476, 109 S.Ct. 1248, 1254, 103 L.Ed.2d 488 (1989). The parameters of BPA's authority, *i.e.*, the business-like manner in which it is intended to operate, coupled with the inference of authority to arbitrate that flows from the authority to contract and settle, as discussed in *Bailey*, allow the Administrator in this case to submit the claim to arbitration. Although the OLC Memorandum did not determine the specific scope of an agency's statutory authority, a reasonable construction of the authorizing statute grants the Administrator the required authority. No impediment is created by the lack of express statutory authority, as concluded in the OLC Memorandum. *See* OLC Memorandum at 26 ("Absent a statute to the contrary ... we perceive no broad constitutional prohibition on the government entering into binding arbitration."). Thus, the BPA Administrator acted within his power by agreeing to a provision that obligates BPA to binding arbitration.

### 3. *The contractual arbitration clause*

▮ Recognizing no constitutional impediment or statutory bar to compelling arbitration, defendant must still establish a contractual basis for the requested stay. Arbitration is essentially a matter of contract between the parties; "it is a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration." *First Options of Chicago, Inc. v. Kaplan,* —— U.S. ——, ——, 115 S.Ct. 1920, 1924, 131 L.Ed.2d 985 (1995).

▮ In order to compel arbitration, the parties must have agreed, as a matter of contract law, to send the particular issue to an arbitrator. Whether the issue is within the realm of the parties' agreement, or whether there was an agreement at all to arbitrate, is an issue properly before the court. *First Options,* —— U.S. at ——, 115 S.Ct. at 1923. This inquiry is important because "a party who has not agreed to arbitrate will normally have a right to a court's decision about the merits of its dis-

pute.... But, where the party has agreed to arbitrate, he or she, in effect, has relinquished much of that right's practical value." *Id.* As to who decides the arbitrability of a question, that, too, is a matter of private contract between the parties. *Id.*

▮ Plaintiff argues that the series of events at issue are outside of the intent of the parties as expressed in the arbitration agreement. The court also has expressed particular concern with the binding nature of the proceedings.

### 1) *Binding arbitration and enforceability*

One issue that had remained unclear is the extent to which BPA is voluntarily and completely entering a process of binding arbitration. Absent adequate assurances from the Department of Justice that the result of the proceedings is to be fully binding on the Government, the court would not remit the parties to arbitration.

The OLC Memorandum, and representations made by defense counsel during argument, present a more definite picture of the nature of the proceedings that defendant asks the court to compel. Defense counsel, speaking for the Attorney General, specifically, emphatically, and in a straightforward manner assured the court that, to the extent allowable by law and the Constitution, any decision by the chosen arbitrator will be fully enforceable by the prevailing party in the Court of Federal Claims. Judicial review will be limited to a claim of corruption, fraud, or undue means. *See* 9 U.S.C. § 10. The position taken by defense counsel is supported by the OLC Memorandum, which is predicated on the notion of "binding" arbitration. The topic of the OLC Memorandum itself is the constitutional limitations on Federal Government participation in binding arbitration.

▮ Limitations, of course, inhere in the power of the arbitrator. Plaintiff seeks, for example, a decision requiring BPA to continue to perform during arbitration proceedings, as the agreement contemplates. However, specific performance is not a remedy available against the United States, because sovereign immunity has not been waived for

such relief. *United States v. Jones,* 131 U.S. 1, 18–19, 9 S.Ct. 669, 671–72, 33 L.Ed. 90 (1889); *see also Fidelity Constr. Co. v. United States,* 700 F.2d 1379, 1384 (Fed.Cir.1983), *cert. denied,* 464 U.S. 826, 104 S.Ct. 97, 78 L.Ed.2d 103 (1983). Issuance of an injunction similarly is not available in the circumstances of this case. *See* 28 U.S.C. § 1491(a)(3) (1988 & Supp. V 1993) (limiting court's injunctive power to cases filed before contract award). Thus, although the arbitration clause calls for binding submission of "any controversy or claim arising out of or relating to" the contract, all the remedies available to two private parties in a lawsuit are not available in this forum. Submission of the claim to a private arbitrator, rather than the Court of Federal Claims, will not divest either party of a remedy that otherwise would be available.

### 2) *Applicability of the arbitration clause to the facts in question*

■■■ Noting once again that arbitrability of issues is a simple matter of contract law, *AT & T Tech., Inc. v. Communication Workers of Am.,* 475 U.S. 643, 649, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986), it is necessary to turn to the exact language in question to determine what the parties intended to be within the scope of the agreement and whether the events in issue fall within the agreement's parameters.

The clause is quoted again, as follows:

Pending resolution of a disputed matter, the Parties shall continue performance of their respective obligations pursuant to this Agreement. Disputes regarding any matter relating to this Agreement shall be discussed by the Authorized Representatives who shall use their best efforts to amicably and promptly resolve the dispute. Should the Authorized Representatives be unable to resolve any controversy or claim arising out of or relating to this Agreement, or the breach thereof, the Parties agree that the controversy or claim shall be settled by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association, and judgment upon the award rendered by the

Arbitrator(s) may be entered in any court having jurisdiction thereof.

The clause requires private, binding arbitration of any dispute subject to its terms. What remains in dispute is whether this particular course of events falls within the ambit of the clause, or whether actions taken by BPA render the clause ineffective and inapplicable. If arbitration is ordered, it must be " 'in the manner provided for in the [parties' arbitration] agreement.' " *Volt,* 489 U.S. at 475, 109 S.Ct. at 1253 (quoting 9 U.S.C. § 4).

Plaintiff advances several theories as to why the events that have taken place in this case are not within the contemplation of the agreement to arbitrate. Primarily, plaintiff considers that certain qualifications within the clause, and a failure by BPA to act within the requirements of the clause, negate its applicability. Defendant counters that the unique circumstances of this case do come within the broad language of the clause and that plaintiff's arguments are without legal merit.

Of material importance is the first sentence of the arbitration clause. The parties provided that "[p]ending resolution of a disputed matter, the Parties shall continue performance of their respective obligations pursuant to this Agreement." The BPA Administrator took the position that BPA was excused fully from any further obligations since events occurred after the formation of the contract that frustrated BPA's purpose and rendered the goals nugatory.

Were this a contract solely between private parties, the positions might be easier to reconcile. A court or arbitrator could order the parties to continue performance pending resolution. *See, e.g., Peabody Coalsales Co. v. Tampa Elec. Co.,* 36 F.3d 46, 48 (8th Cir.1994) (affirming injunction requiring performance pending arbitration). In fact, the qualifying language of the clause which requires continued performance might allow a court to grant injunctive relief without passing on the merits of the claim. *Id.* at 47. Therefore, although the parties might have contemplated an order compelling performance as an option pending dispute resolution, that remedy is not available against a federal agency. What is within plaintiff's

rights, however, is a suit for damages for failure to continue performance under the contract pending dispute resolution.

Plaintiff primarily relies on a 1920 opinion by Justice Oliver Wendell Holmes, *Rederiaktiebolaget Atlanten v. Aktieselskabet Korn–Og Foderstof (The Atlanten)*, 252 U.S. 313, 40 S.Ct. 332, 64 L.Ed. 586 (1920). Affirming a decision by United States District Court Judge Learned Hand which refused to order arbitration, the Supreme Court held "that the owner repudiated the contract and that the arbitration clause did not apply" since it referred to "disputes that might arise while the parties were trying to go on with the execution of the contract—not to a repudiation of the substance of the contract." *Id.* at 315–16, 40 S.Ct. at 332–33. While the facts of *The Atlanten* cannot be dismissed as wholly distinguishable from the facts of this case, what is clear is that *The Atlanten* was written before passage of the FAA during a period of distinct hostility by the judiciary to private arbitration. Moreover, *The Atlanten* is the sole occupant of the niche in the case law under the proposition for which it stands. Other cases have questioned its validity in the more modern legal climate. *See, e.g., American Locomotive Corp. v. Chemical Research Corp.*, 171 F.2d 115, 120 (6th Cir. 1948), *cert. denied*, 336 U.S. 909, 69 S.Ct. 515, 93 L.Ed. 1074 (1949); *In re Utility Oil Corp.*, 69 F.2d 524, 524–26 (2d Cir.1934), *cert. denied*, 292 U.S. 655, 54 S.Ct. 866, 78 L.Ed. 1504 (1934). Although the facts of this case might fit the earlier opinion of *The Atlanten*, the theory does not remain viable given the increased recognition of arbitration. Defendant also points out that the arbitration clause in *The Atlanten*, unlike that in the case at bar, applied expressly to claims for breach of contract and that defendant in that case admitted the breach. These distinctions are not sufficiently persuasive. The court declines to follow *The Atlanten* because the developments in dispute resolution have superseded it.

■ As a matter of contract law, it is the court's duty to determine the intent under which the parties entered the arbitration agreement and the disputes to be included. *Volt*, 489 U.S. at 478, 109 S.Ct. at 1255.

What constitutes "any controversy or claim" is a matter of construction for the court. The clause is facially broad, and it is not the duty of the court to carve out exceptions to the agreement. *See United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 584–85, 80 S.Ct. 1347, 1354, 4 L.Ed.2d 1409 (1960) ("In the absence of any express provision excluding a particular grievance from arbitration, we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail"). To the contrary, this court is guided by the principle "that the arbitration procedure, when selected by the parties to a contract, be speedy and not subject to delay and obstruction in the courts." *See Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404, 87 S.Ct. 1801, 1806, 18 L.Ed.2d 1270 (1967).

Modern case law, long after *The Atlanten*, has determined that whether a party has breached a contract, is entitled to rescind it, or is otherwise excused from performance is an issue for arbitrators, not the courts, if within the contractual language. *Prima Paint*, 388 U.S. at 406 (holding that claim for rescission of contract because of fraud in inducement was for arbitrators to determine); *accord Unionmutual Stock Life Ins. Co. v. Beneficial Life Ins. Co.*, 774 F.2d 524, 528–29 (1st Cir.1985) (holding that party's attempt to rescind contract on grounds of mutual mistake and frustration of purpose is arbitrable); *Sharon Steel Corp. v. Jewell Coal & Coke Co.*, 735 F.2d 775, 778 (7th Cir.1984) (holding that dispute over cancellation of contract is arbitrable); *Hamilton Life Ins. Co. v. Republic Nat'l Life Ins. Co.*, 408 F.2d 606, 610 (2d Cir.1969) (holding that "repudiation of principal contract does not operate to nullify an agreement to arbitrate") (emphasis omitted).

In addition to arguing that termination of the contract is not within the scope of the arbitration clause, plaintiff claims that the BPA Administrator has materially breached the clause and thus should not be entitled to the benefits of arbitration. Plaintiff cites *Peabody*, 36 F.3d at 49, and *Recon/Optical, Inc. v. Government of Israel*, 816 F.2d 854, 857 (2d Cir.1987). In each case the appellate

court highlighted contractual provisions that required continued performance pending arbitration. Substantial differences exist between the cited cases and this case regarding the facts and nature of the proceedings. As to the facts, in *Peabody* a contractor was late for a series of coal deliveries, while in *Recon* the dispute centered around a failure to meet contract specifications. *Peabody*, 36 F.3d at 47; *Recon*, 816 F.2d at 856. In neither of the cases did a party claim total excuse from the contract due to frustration of purpose; rather, each case dealt with an interim dispute where continued performance was explicitly required by the contract and made sense. In addition, each case was between private contractors, and an injunction to compel performance was available to the parties. In this case no such option is available due to sovereign immunity. Inability to obtain an injunction, though, does not render the arbitration provision nugatory. *Connecticut Res. Recovery Auth. v. Occidental Petroleum Corp.*, 705 F.2d 31, 37 (2d Cir.1983). Rather, to the extent that the arbitrators may determine that BPA is at fault for failing to continue performance, money damages are available to provide a remedy.

The strong policy favoring arbitration thus compels the court to defer to the parties' agreement. *See Moses H. Cone Mem. Hosp.*, 460 U.S. at 24, 103 S.Ct. at 941 (any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration); *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582–83, 80 S.Ct. 1347, 1352–53, 4 L.Ed.2d 1409 (1960) ("[U]nless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute ... [d]oubts should be resolved in favor of coverage."). As the Supreme Court explained, "By its terms the [Federal Arbitration] Act leaves no place for the exercise of discretion by a ... [trial] court, but instead mandates that ... [trial] courts shall direct the parties to proceed to arbitrate over issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 218, 105 S.Ct. 1238, 1241, 84 L.Ed.2d 158 (1985) (emphasis omitted).

Conceptually, requiring a party to continue performance under an arbitration clause by paying for construction of a power facility when that party is claiming that the contract terminated during construction makes little sense. Whether BPA has repudiated or breached the contract and whether BPA's performance obligations shall be excused or discharged are disputed matters that properly lie before the arbitrator. While the clause does require continued performance, the nature of BPA's action logically negates that duty. Whether such an action is within BPA's legal rights is a matter to be resolved. Such a dispute therefore comes within the clause's ambit of "any controversy or claim arising out of or relating to this Agreement, or the breach thereof."

## CONCLUSION

Based on the foregoing, defendant's motion to dismiss or stay and to compel arbitration is granted insofar as the proceedings are stayed pending arbitration, and plaintiff's cross-motion is granted insofar as BPA is bound to the decision of the arbitrator, except for the limited judicial review specified in 9 U.S.C. § 10, and is otherwise denied. Accordingly,

**IT IS ORDERED,** as follows:

1. Pursuant to RCFC 42(a), plaintiff's motion to consolidate this case is granted, and this case is consolidated with No. 95–637C.

2. Proceedings in these consolidated cases are stayed pending issuance of a final decision by the arbitrator pursuant to the terms of the Dispute Resolution clause in the parties' agreement.

3. Granting defendant's motion to stay is conditioned expressly on the Department of Justice's and BPA's commitment to uphold binding arbitration in this case. As such, the BPA Administrator retains no power to approve or disapprove the arbitration decision, other than to seek limited judicial review.

4. The court retains jurisdiction of these cases pending conclusion of the arbitration proceedings. The parties shall inform the court in a Joint Status Report to be filed within 10 days after the arbitrator issues a

final decision regarding their intentions with respect to further proceedings in these actions.